UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No.: 06-14320-Civ-Moore/Lynch

| | |
|---|---|
| GAY-STRAIGHT ALLIANCE OF OKEECHOBEE HIGH SCHOOL, an unincorporated association and YASMIN GONZALEZ, through her parent and next friend Frankie Michelle Gonzalez, | ) ) ) ) ) ) |
| Plaintiffs, | ) |
| vs. | ) ) |
| SCHOOL BOARD OF OKEECHOBEE COUNTY and TONI WIERSMA, individually and in her official capacity as principal of Okeechobee High School, | ) ) ) ) ) |
| Defendants. | ) ) |

_____

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
AND ACCOMPANYING MEMORANDUM OF LAW

Plaintiffs GAY-STRAIGHT ALLIANCE OF OKEECHOBEE HIGH SCHOOL and

YASMIN GONZALEZ request that the Court enter a preliminary injunction pursuant to Fed. R.

Civ. P.  65(a) enjoining defendants SCHOOL BOARD OF OKEECHOBEE COUNTY and

TONI WIERSMA from denying equal access, treatment, and club recognition to plaintiffs at

Okeechobee High School.  The grounds for this motion are set forth in the accompanying

memorandum of law.

## MEMORANDUM OF LAW

### FACTS[1]

Yasmin Gonzalez is a student at Okeechobee High School ("OHS").  *See* Declaration of

Yasmin Gonzalez at ¶1 (hereafter "YG1 at 1"), attached as Exhibit A.  Yasmin is the

Okeechobee GSA president.   The Okeechobee GSA is a voluntary unincorporated association

made up of students who attend OHS.  YG1 at 3.  OHS is a high school located in Okeechobee,

Florida and is governed by the School Board of Okeechobee County ("SBOC").  *Id*. at 4.

Along with several other members of the GSA, Yasmin and student Amber Sewell sought

official recognition of the GSA as a school club in September of the 2006-07 school year by

securing a teacher to serve as sponsor and seeking the approval of the school's principal, Ms.

Toni Wiersma ("Wiersma").  *Id*. at 5.  They sought official recognition of their club so that they

could meet at school (as opposed to off-campus as they currently do) and have access to a variety

of privileges afforded numerous non-curriculum related clubs at OHS.

The purpose of the GSA is to provide a safe, supportive environment for students to talk

about harassment and violence against gay and lesbian students at OHS, and to work together to

promote tolerance, understanding, and acceptance of one another, regardless of sexual

orientation.  *Id*. at 6.  The GSA presented Wiersma with a written constitution to govern the

proposed club and set forth this purpose.  *Id*. at 8.

The GSA attempted to secure approval from Wiersma in accordance with board policy

and school rules.  Wiersma delayed making any decision for several weeks.  *Id*. at 7.  Wiersma

---

[1] "At the preliminary injunction stage, a district court may rely on affidavits and hearsay
materials which would not be admissible evidence for a permanent injunction, if the evidence is
appropriate given the character and objectives of the injunctive proceeding."  *Levi Strauss & Co.
v. Sunrise Int'l Trading, Inc.*, 51 F.3d 982, 985 (11th Cir. 1995) (quotation omitted).

ultimately refused to grant recognition to the club and denied it access to OHS facilities, citing (in the same conversation) as reasons a) that the school already had *too many* clubs and b) that the school would not allow *any* non-curricular clubs to organize.  *Id*. at 9.

Other non-curricular clubs are, in fact, officially recognized and granted access to OHS. *Id*. at 10.  Other officially recognized non-curricular clubs that have been listed during the 2006-07 school year on the OHS website include:  National Beta Club; Crime Watch; Envirothon; Future Business Leaders of America; Fellowship of Christian Athletes; Future Farmers of America; Finance Academy; Heath Occupations Students of America; Interact Club; Key Club; Quill & Scroll; and Student Council.  *Id*. at 11.   The Color Guard is also listed and pictured on the OHS website.  *See* Exhibit B.

OHS' current student handbook lists the following non-curriculum related clubs: Class of 2007; Class of 2008; Class of  2009; Envirothon; Future Business Leaders of America; Fellowship of Christian Athletes; Future Farmers of America; Finance Academy; Heath Occupations Students of America; Interact Club; Key Club; Majorettes; National Beta Club; Poetry Club; Student Council; and Youth Crime Watch.  *Id*. at 12.

As listed on the OHS website, OHS grants access to several non-curricular sports organizations, including:  Baseball; Basketball; Bowling; Cheerleading; Cross Country; Flag Football; Football; Golf; Rodeo; Soccer; Softball; Swimming; Tennis; Track; Volleyball; Weightlifting; and Wrestling.  *Id*. at 13.

Other clubs that have used and continue to use school facilities include the Chess Club; Japanese Club; Junior Cattleman's Association; Poetry Club; Venturing Team;

Drill Team; Color Guard; and Card Club.  *Id*. at ¶17; *see also Second Declaration of Yasmin Gonzalez*, ¶10 (hereafter "YG2 at 10")(attached as Exhibit C).

OHS listed and pictured the following non-curricular student groups in the OHS yearbook in 2005:  Key Club; Majorettes; A-Team; Fellowship of Christian Athletes; Beta Club; Future Educators of America; Chess Club; Heath Occupations Students of America; Crime Watch; Interact Club; Poetry Club; Junior Cattlemen's Association; Future Farmers of America; Future Business Leaders of America; and Finance Academy. *See Excuse the Interruptions 2005 Brahman Volume 59*, attached as Exhibit J to *First Amended Complaint*.

OHS listed and pictured the following non-curricular student groups in the OHS yearbook in 2006:  OHS News; Chess Club; Future Farmers of America; Fellowship of Christian Athletes; Japanese Club; A-Team; Key Club; Heath Occupations Students of America; Future Business Leaders of America; Jr. Cattlemen's Association; Beta Club; and the Poetry Club.  *See Making Waves 2006 Brahman Volume 60*, attached as Exhibit J to *First Amended Complaint*.

OHS allows other non-curricular student groups to announce their activities over the OHS public address system.  Recently, students have heard announcements advertising activities for such clubs as the Crocheting Club and the Sign Language Club.  YG1 at 14.   Students have also seen posters hanging in the halls advertising the activities of other non-curricular clubs, including the National Beta Club.  *Id*. at 16.

OHS also allows some student groups access in the form of advertising in the official OHS school calendar.  Two groups that take advantage of this access are the Powder Puff Football student group and the Miz Senior Contest group.

Despite the fact that OHS recognizes and grants privileges to these many non-curriculum related student groups, Wiersma again claimed when notified by GSA counsel that she was acting unlawfully that "we do not allow any clubs or organizations which are not related to the standard curriculum to organize or meet at Okeechobee High School" in a letter copied to Dr. Patricia G. Cooper, Superintendent of Schools, and Tom Conely, School Board Attorney.  *See Letter from Toni Wiersma*, attached as Exhibit D.

Official student group status confers a number of benefits on student groups, including rights to be listed on OHS club lists, use the OHS public address system, meet on OHS property, post club-related information at OHS, use OHS equipment and resources, and to be photographed and listed in the OHS yearbook  *Id*. at 18.

ARGUMENT

The Court should grant the requested preliminary injunctive relief because Plaintiffs establish each of the following: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) that the threatened injury to the plaintiff outweighs the harm an injunction may cause the defendant; and (4) that granting the injunction would not disserve the public interest.  *Teper v. Miller*, 82 F.3d 989, 992 n.3 (11th Cir. 1996) (citation omitted).

I.    PLAINTIFFS ARE SUBSTANTIALLY LIKELY TO SUCCEED ON THE
      <u>MERITS OF THEIR CLAIMS</u>.

      A.    *The Right To Form A Non-Curricular Group Under The EAA.*

The federal Equal Access Act ("EAA") provides as follows:

It shall be unlawful for any public secondary school which receives Federal financial
assistance and which has a limited open forum to deny equal access or a fair opportunity
to, or discriminate against, any students who wish to conduct a meeting within that
limited open forum on the basis of the religious, political, philosophical, or other content
of the speech at such meetings.

20 U.S.C. § 4071(a).  The Act defines the term "limited open forum" as follows: "A public

secondary school has a limited open forum whenever such school grants an offering to or

opportunity for one or more noncurriculum related student groups to meet on school premises

during noninstructional time."  20 U.S.C. § 4071(b).  Thus, "if a public secondary school allows

even one 'noncurriculum related student group' to meet, the Act's obligations are triggered and

the school may not deny other clubs, on the basis of the content of their speech, equal access to

meet on school premises during noninstructional time."  *Bd. of Educ. v. Mergens*, 496 U.S. 226,

236 (1990).[2]

The mandate of the EAA is an expansive one.  As the Supreme Court has recognized,

"Congress[] inten[ded] to provide a low threshold for triggering the Act's requirements."  *Id*. at

240.[3]

      The breadth of the term "meeting." The EAA broadly defines the term "meeting:" "The

---

[2] *See also id.* at 259 (Kennedy, J., concurring) ("[O]ne of the consequences of the statute, as we
now interpret it, is that clubs of a most controversial nature might have access to the student life
of high schools that in the past have given official recognition only to clubs of a more
conventional kind.") (citation omitted).

[3] *See also id.* at 239 ("A broad reading of the Act would be consistent with the views of those
who sought to end discrimination by allowing students to meet and discuss religion before and
after classes.").

term 'meeting' includes those activities of student groups which are permitted under a school's limited open forum and are not directly related to the school curriculum." 20 U.S.C. § 4072(3).

In other words, the EAA not only dictates equality of terms schools use when allowing non-curricular groups to meet. The EAA also requires equal treatment when a school recognizes non-curricular groups and permits them to engage in activities, use school resources, and otherwise enjoy school privileges. *Mergens*, 496 U.S. at 247 ("Although the school apparently permits respondents to meet informally after school, respondents seek equal access in the form of official recognition by the school. Official recognition allows student clubs to be part of the student activities program and carries with it access to the school newspaper, bulletin boards, the public address system, and the annual Club Fair . . . . [W]e hold that [the school's] denial of [the students'] request to form a Christian club denies them 'equal access' under the Act.") (citations omitted).

Complementing the expansive definition of the term "meeting" is the expansive prohibition on differential treatment. Under the EAA, a school may neither "deny equal access to," nor "[deny] a fair opportunity to," nor otherwise "discriminate against" a non-curricular group. 20 U.S.C. § 4071(a). Thus, under the EAA, where a school recognizes one non-curricular group or permits it to engage in activities, use school resources, or otherwise enjoy school privileges, it must do likewise for all other non-curricular groups. For example, where a school permits one non-curricular group to use its public address system, bulletin boards, or website to publicize a meeting, it must permit all other non-curricular groups to do likewise.

The breadth of the term "student group." By its terms, the EAA is not concerned only with non-curricular groups that are denominated as "clubs." Nor is it concerned only with non-

curricular groups that are initiated by students.  It is not concerned only with non-curricular groups that seek primarily to engage in speech.  Rather, it is concerned with all non-curricular groups, regardless of how they are denominated, how they are initiated, or what they seek primarily to do.  *Colin v. Orange Unified School Dist.,* 83 F. Supp.2d 1135 (C.D.Cal. 2000) ("Once a school recognizes any [non-curricular] group, it has created a limited open forum.").[4]

The breadth of the term "noncurriculum related."  In *Mergens*, after a careful assessment of the statutory text and the legislative history of the EAA, the Supreme Court concluded that the term "noncurriculum related student groups" "is best interpreted broadly" to include all student groups that do not satisfy one or more of following four criteria: (1) "the subject matter of the group is actually taught, or will soon be taught, in a regularly offered course;" (2) "the subject matter of the group concerns the body of courses as a whole;" (3) "participation in the group is required for a particular course;" or (4) "participation in the group results in academic credit." *Mergens*, 496 U.S. at 239-40.

Schools bear the burden of proving that recognized student groups are curricular.  *Pope by Pope v. East Brunswick Bd. of Educ.*, 12 F.3d 1244, 1253 (3rd Cir. 1993)("The burden of showing that a group is directly related to the curriculum rests on the school district.") (citation

---

[4] *See also Mergens*, 496 U.S. at 241-43 (rejecting a narrow conception of EAA student groups that extended only to advocacy groups); *Pope v. E. Brunswick Bd. of Educ.,* 12 F.3d 1244, 1250-51 (3d Cir. 1993) ("A limitation to student-initiated groups defeats the broader purpose of the statute.  A school with many faculty-initiated student groups can largely preempt demand for student-initiated groups.  The result could be an open forum for mainstream interests and views, all sponsored by the faculty, with minority views excluded because of faculty hostility or indifference . . . . We therefore conclude that student initiation of clubs and other groups is not a requirement for triggering the EAA.") (quotation and footnote omitted); *Van Schoick v. Saddleback Valley Unified Sch. Dist.*, 104 Cal. Rptr. 2d 562, 569 (Cal. Ct. App. 2001) ("[The school] argue[s] even if [it] is deemed to be a limited open forum, the FCA is not entitled to protection under the FEAA because the group was not student initiated . . . . We disagree.").

omitted).[5]  Moreover, in this regard, courts owe schools no particular deference.  *Mergens*, 496

U.S. at 240 ("[S]uch determinations would be subject to factual findings well within the

competence of trial courts to make.").[6]

Furthermore, in proving that the subject matter of a recognized student group is in fact

taught or in fact will soon be taught in a regularly offered course, or that the subject matter of the

group in fact concerns the body of courses as a whole, a school may not simply point to the

purported subject matter of the group as evinced, for example, by the subject matter of its by-

laws.  Rather, the school must point to the actual subject matter of the group as evinced, for

example, by the subject matter of its meetings.  *E. High Gay/Straight Alliance v. Bd. of Educ.*, 81

F. Supp.2d 1166, 1180 (D. Utah 1999) ("The court must examine the record of the student

groups' actual activities as well as their stated purposes in order to make a qualitative

determination as to curriculum-relatedness.").[7]  Moreover, a school may not simply claim

ignorance of the actual subject matter of the group.[8]

_____

[5] *See also Mergens*, 496 U.S. at 240 ("[U]nless a school could show that groups such as a chess club, a stamp collecting club, or a community service club fell within our description of groups that directly relate to the curriculum, such groups would be 'noncurriculum related student groups' for purposes of the Act.").

[6] *See also id.* at 245 ("Complete deference to the school district would render the Act meaningless because school boards could circumvent the Act's requirements simply by asserting that all student groups are curriculum related.") (quotation omitted).

[7] *See also Mergens*, 496 U.S. at 246 ("[O]ur definition of 'noncurriculum related student activities' looks to a school's actual practice rather than its stated policy."); *Donovan ex rel. Donovan v. Punxsutawney Area School Bd.,* 336 F.3d 211, 223 (3rd Cir. 2003)("Just as putting a 'Horse' sign around a cow's neck does not make a bovine equine, a school's decision that a free-wheeling activity period constitutes actual classroom instructional time does not make it so.").

[8] *See Boyd County High Sch. Gay Straight Alliance v. Bd. of Educ.,* 258 F. Supp.2d 667, 685-86 (E.D. Ky. 2003) ("Regardless of [the school's] purported lack of knowledge of these …

Similarly, in proving that the subject matter of a recognized student group in fact concerns the body of courses as a whole, a school must prove that it "has more than just a tangential or attenuated relationship to courses offered by the school."  *Mergens*, 496 U.S. at 238. These are the safeguards against the self-defeating construction of the EAA identified by the Supreme Court in *Mergens*:

> To the extent that [the school] contend[s] that 'curriculum related' means anything remotely related to abstract educational goals . . . we reject that argument.  To define 'curriculum related' in a way that results in almost no schools having limited open fora, or in a way that permits schools to evade the Act by strategically describing existing student groups, would render the Act merely hortatory . . . . Allowing such a broad interpretation of 'curriculum-related' would make that Act meaningless.  A school's administration could simply declare that it maintains a closed forum and choose which student clubs it wanted to allow by tying the purposes of those student clubs to some broadly defined educational goal.

*Mergens*, 496 U.S. at 244-45.  Accordingly, in *Mergens*, the Supreme Court rejected the school's generalized arguments that its recognized student groups were curricular because they variously "further[ed] the School's overall goal of developing effective citizens by requiring student members to contribute to their fellow students" (student orientation club), "advance[d] the goals of the School's political science classes by providing an understanding and appreciation of government processes" (student government clubs), "further[ed] one of the essential goals of the Physical Education Department – enabling students to develop lifelong recreational interests" (scuba diving club), "supplement[ed] math and science courses because [they] enhance[d] students' ability to engage in critical thought process" (chess club), and "promote[d] effective citizenship, a critical goal of the [school] curriculum, specifically the Social Studies Department"

_____

…meetings, the EAA does not permit schools to use their lack of knowledge as a defense . . . . Given the conspicuous location and number of the meetings, the court finds [the school] either knew or should have known the meetings were occurring.").

(community service clubs).  *Id.* at 244.[9]

The case law confirms that the mandate of the EAA is an expansive one.[10]   Moreover, the case law confirms that the mandate of the EAA applies equally to the type of non-curricular group at issue in this case – the GSA.[11]  In sum, where a school permits even one non-curricular (broadly defined) group (broadly defined) to meet (broadly defined) on school premises during non-instructional time, it must permit all other non-curricular groups (including GSAs) to do so, and to do so on equal terms.

> B.    *Defendants are violating Plaintiffs' statutory right to equal access under the EAA.*

The Gay-Straight Alliance of Okeechobee High School is a non-curricular group that has sought to meet on school premises during non-instructional time on terms equal to those on which other non-curricular groups have met.

When the students first informed Wiersma that they intended to form a GSA, Wiersma ignored them.  After employing "a pattern of delay and discrimination" similar to that prohibited by the court in *Colin*, 83 F. Supp. 2d at 1149, Defendants simply refused to allow the GSA to meet on school property.

---

[9] *See also Pope*, 12 F.3d at 1252.

[10] *Mergens*, 496 U.S. 226 (1990) (Christian club); *Donovan*, 336 F.3d 211 (3d Cir. 2003) (Bible club); *Prince v. Jacoby*, 303 F.3d 1074 (9th Cir. 2002) (Bible club); *Ceniceros*, 106 F.3d 878 (9th Cir. 1997) (religious club); *Hsu v. Roslyn Union Free Sch. Dist. No. 3*, 85 F.3d 839 (2d Cir. 1996)(Bible club); *Pope*, 12 F.3d 1244 (3d Cir. 1993) (Bible club); *Garnett*, 1994 WL 555397 (W.D. Wash. 1994) (religious club); *Student Coalition*, 633 F. Supp. 1040 (E.D. Pa. 1986) (advocacy group); *Hoppock v. Twin Falls Sch. Dist. No. 411*, 772 F. Supp. 1160 (D. Idaho 1991) (Christian club); *Van Schoick*, 104 Cal. Rptr. 2d 562 (Cal. Ct. App. 2001) (Fellowship of Christian Athletes).

[11] *Boyd*, 258 F. Supp. 2d 667 (E.D. Ky. 2003); *Franklin*, 2002 WL 32097530 (S.D. Ind. Aug. 30, 2002); *Colin*, 83 F. Supp. 2d 1135 (C.D. Cal. 2000); *E. High*, 81 F. Supp. 2d 1166 (D. Utah 1999).

When Wiersma finally responded, she stated that she was denying access to the GSA because there were too many extracurricular clubs at OHS, and, in the same breath, Wiersma stated that she was denying the GSA access because she does not allow any extracurricular clubs at OHS.  When undersigned counsel wrote to Wiersma to inform her that her actions violated the Equal Access Act, she responded by letter dated October 23, 2006 that "we do not allow any clubs or organizations which are not related to the standard curriculum to organize or meet at Okeechobee High School."  *See* Exhibit D.

In an article that appeared in the November 2, 2006 edition of the Okeechobee News, district superintendent Dr. Patricia Cooper is quoted as stating that the GSA was denied access because of unrest at the school and because "[w]e are an abstinence-only district and we do not condone or promote any type of sexual activity."  *See Club for gays at OHS denied*, Pete Gawda, Okeechobee News November 2, 2006, attached as Exhibit E.

The article goes on to quote Assistant Superintendent of Schools Ken Kenworthy, who admitted that quintessential viewpoint discrimination was the true motivation for denying access to the GSA: "We don't feel its appropriate in a school setting.  The sexual orientation of a minor belongs in the home."  *Id*.

Neither Wiersma's stated reason, nor any of defendants' *post hoc* justifications for denying access to the GSA pass muster under the Equal Access Act.

Number of Clubs is Irrelevant.  To the extent that defendants intend to rely upon Wiersma's original justification that there are too many extracurricular clubs at OHS, this argument does not help them.  Neither the Equal Access Act nor any case interpreting the Act has ever held that a school is relieved of its responsibility to grant equal access based upon the

number of other clubs.  The only relevant question is whether there is at least one other non-curricular club recognized or granted access.

OHS Does Recognize and Grant Access to Non-Curricular Clubs.  Wiersma's claim that OHS does not have any extracurricular clubs gets defendants no further than the argument that there are too many because there are *many* non-curricular clubs that are granted official recognition and access at OHS.

Courts have found that many of the clubs, groups, and activities at OHS are non-curriculum related student groups that create a limited open forum and subject a school to the strictures of the Equal Access Act.[12]   Some of the non-curricular groups, clubs, organizations, and activities at OHS include:

Chess Club:  During the 2006-07 school year, OHS has recognized the Chess Club and permitted it to meet, engage in activities, use school resources, and otherwise enjoy school privileges on school premises during non-instructional time.  This club is listed and pictured in the OHS yearbook.  *See* Exhibit J to *First Amended Complaint*.  Chess is not actually taught in a regularly offered course and does not concern the curriculum as a whole.  Participation in the group is not required for a particular course and does not result in academic credit.  Courts have

---

[12] The question of whether a particular student group at a particular school is directly related to the school's curriculum is an individualized assessment that courts are directed to apply on a case by case basis.  So, while one court's determination that a club at a particular high school is non-curricular does not control here, such cases are at least instructive here. *Westside Community Board of Education v. Mergens*, 496 U.S. 226, 240, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990)("Whether a specific student group is a "noncurriculum related student group" will therefore depend on a particular school's curriculum, but such determinations would be subject to factual findings well within the competence of trial courts to make.").

uniformly held that a chess club is non-curricular when the school does not offer a chess class.[13]
YG2 at 10(ff).

     <u>Japanese Club</u>:  During the 2006-07 school year, OHS has recognized the Japanese Club
and permitted it to meet, engage in activities, use school resources, and otherwise enjoy school
privileges on school premises during non-instructional time.  Japanese club is listed and pictured
in the OHS yearbook.  *See* Exhibit J to *First Amended Complaint*.  Japanese is not actually
taught in a regularly offered course and does not concern the curriculum as a whole.
Participation in the group is not required for a particular course and does not result in academic
credit.  YG2 at 10(gg).  The United States Supreme Court has stated that a foreign language club
is not directly related to a school's curriculum unless the school offers a class for credit teaching
that particular language.[14]

     <u>Junior Cattleman's Association</u>: During the 2006-07 school year, OHS has recognized the
JCA and permitted it to meet, engage in activities, use school resources, and otherwise enjoy
school privileges on school premises during non-instructional time.   JCA activities are not
actually taught in a regularly offered course and do not concern the curriculum as a whole.
Participation in the group is not required for a particular course and does not result in academic
credit.  YG2 at 10(hh).

---

[13] *Mergens*, 496 U.S. at 240(Chess Club is noncurricular if school does not offer chess class);
*Garnett v. Renton School Dist.*, 772 F. Supp. 531, 534 (W.D.Wash.1991), *rev'd* on other
grounds, 987 F.2d 641 (9th Cir.1993), *cert*. denied, 510 U.S. 819, 114 S.Ct. 72, 126 L.Ed.2d 41
(1993), on remand, 1994 WL 555397 (W.D.Wash.1994), appeal after remand, 21 F.3d 1113,
1994 WL 134272 (9th Cir.1994) (Table, Text in Westlaw)(same).

[14] "[A] French club would directly relate to the curriculum if a school taught French in a
regularly offered course or planned to teach the subject in the near future"  *Mergens*, 496 U.S. at
240.

Card Club:  During the 2006-07 school year, OHS granted access to the Card Club and permitted it to meet, engage in activities, use school resources, and otherwise enjoy school privileges on school premises during non-instructional time.  Card Club engages in activities involving making greeting cards and scrap books.  Card Club activities are not actually taught in a regularly offered course and do not concern the curriculum as a whole.  Participation in the group is not required for a particular course and does not result in academic credit.  YG2 at 10(ii).

Color Guard:  During the 2006-07 school year, OHS has recognized the Color Guard and permitted it to meet, engage in activities, use school resources, and otherwise enjoy school privileges on school premises during non-instructional time.  Color Guard is an activity listed and pictured on the official OHS website.  *See* Exhibit B.  Color Guard activities are not actually taught in a regularly offered course and do not concern the curriculum as a whole.  Participation in the group is not required for a particular course and does not result in academic credit.  Though Color Guard members are required to be in the ROTC class, it is not a requirement for ROTC class that one participate in the Color Guard or any other club.  YG2 at 10(jj).

Drill Team:  During the 2006-07 school year, OHS has recognized the Drill Team and permitted it to meet, engage in activities, use school resources, and otherwise enjoy school privileges on school premises during non-instructional time.  Drill is not actually taught in a regularly offered course and does not concern the curriculum as a whole.  Participation in the group is not required for a particular course and does not result in academic credit.  Though Drill Team members are required to be in the ROTC class, it is not a requirement for ROTC class that one participate in the Drill Team or any other club.  YG2 at 10(kk).

Powder Puff Football:  During the 2006-07 school year, OHS has recognized Powder Puff Football and permitted it to meet, engage in activities, use school resources, and otherwise enjoy school privileges on school premises during non-instructional time.  Powder Puff Football activities are listed on the official OHS school calendar.  *See* OHS September 2006 calendar, attached as Exhibit F.  Powder Puff Football is not actually taught in a regularly offered course and does not concern the curriculum as a whole.  Powder Puff Football activities include games between seniors and juniors where female students play flag football while male students act as cheerleaders. Participation in the group is not required for a particular course and does not result in academic credit.  YG2 at 10(ll).

Miz Senior Contest:  During the 2006-07 school year, OHS has recognized the Miz Senior Contest and permitted it to meet, engage in activities, use school resources, and otherwise enjoy school privileges on school premises during non-instructional time.  The Miz Senior Contest is listed on the official OHS school calendar.  *See* OHS February 2007 calendar, attached as Exhibit G.  Miz Senior Contest activities are not actually taught in a regularly offered course and do not concern the curriculum as a whole.  Miz Senior Contest is a pageant in which male participants dress in female attire and vice-versa, and students elect a "Miz Senior" from the male participants.  Participation in the group is not required for a particular course and does not result in academic credit.  YG2 at 10(mm).

Venturing Team:  During the 2006-07 school year, OHS granted access to the Venturing Team and permitted it to meet, engage in activities, use school resources, and otherwise enjoy school privileges on school premises during non-instructional time.  Venturing (or camping) is not actually taught in a regularly offered course and does not concern the curriculum as a whole.

Venturing Team activities include camping and outdoor activities.  The group meets regularly at OHS to plan its activities.  Participation in the group is not required for a particular course and does not result in academic credit.  YG2 at 10(nn).

Sign Language Club:  During the 2006-07 school year, OHS granted access to the Sign Language Club and permitted it to meet, engage in activities, use school resources, and otherwise enjoy school privileges on school premises during non-instructional time.  Sign language is not actually taught in a regularly offered course and does not concern the curriculum as a whole. Participation in the group is not required for a particular course and does not result in academic credit. YG2 at 8-9.

Crocheting Club:  During the 2006-07 school year, at least one announcement was made over the school's public address system announcing a meeting of the crocheting club on school grounds. Crocheting is not actually taught in a regularly offered course and does not concern the curriculum as a whole.  Participation in the group is not required for a particular course and does not result in academic credit.  YG2 at 8-9.

Crime Watch: During the 2006-07 school year, OHS has recognized a Crime Watch group and permitted it to meet, engage in activities, use school resources, and otherwise enjoy school privileges on school premises during non-instructional time.  Crime Watch is listed both on the official OHS website and in the OHS student handbook.  Crime Watch is listed and pictured in the OHS yearbook.  *See* Exhibit J to *First Amended Complaint*.   Crime detection is not actually taught in a regularly offered course and does not concern the curriculum as a whole. Participation in the group is not required for a particular course and does not result in academic credit.  YG2 at 4(a).

Beta Club:  During the 2006-07 school year, OHS has recognized the Beta Club and permitted it to meet, engage in activities, use school resources, and otherwise enjoy school privileges on school premises during non-instructional time.  Beta Club is listed both on the official OHS website and in the OHS student handbook.  Beta Club is listed and pictured in the OHS yearbook.  *See* Exhibit J to *First Amended Complaint*.  Community Service is not actually taught in a regularly offered course and does not concern the curriculum as a whole.  Participation in the group is not required for a particular course and does not result in academic credit. [15]  YG2 at 4(b).

Envirothon: During the 2006-07 school year, OHS has recognized the Envirothon group and permitted it to meet, engage in activities, use school resources, and otherwise enjoy school privileges on school premises during non-instructional time.  Envirothon is listed both on the official OHS website and in the OHS student handbook.  Envirothon activities are not actually taught in a regularly offered course and do not concern the curriculum as a whole.  Participation in the group is not required for a particular course and does not result in academic credit.  YG2 at 4(c).

Future Business Leaders of America:   During the 2006-07 school year, OHS has recognized the Future Business Leaders of America and permitted it to meet, engage in activities, use school resources, and otherwise enjoy school privileges on school premises during non-

---

[15] *See Mergens*, 496 U.S. at 246 (community service group is non-curricular); *Pope*, 12 F.3d at 1251-54 (community service group is non-curricular); *Boyd*, 258 F. Supp. 2d at 687 (Beta Club is non-curricular); *Colin*, 83 F. Supp. 2d at 1143 (community service group is non-curricular); *Van Schoick*, 104 Cal. Rptr. 2d at 568 ("[C]ommunity service clubs are, at best, only marginally related to the usual high school curriculum."); *but cf.  White County High School Peers Rising in Diverse Education v. White County School District*, 2006 WL 1991990,*5 (N.D.Ga.2006) (Beta Club is curricular).

instructional time.  FBLA is listed both on the official OHS website and in the OHS student

handbook.  FBLA is listed and pictured in the OHS yearbook.  *See* Exhibit J to *First Amended*

*Complaint*.  FBLA activities are not actually taught in a regularly offered course and do not

concern the curriculum as a whole.  Participation in the group is not required for a particular

course and does not result in academic credit.  YG2 at 4(d).  Courts have held that FBLA is a

non-curricular student group creating a limited open forum at a school.[16]

     <u>Future Farmers of America</u>:  During the 2006-07 school year, OHS has recognized the

FFA and permitted it to meet, engage in activities, use school resources, and otherwise enjoy

school privileges on school premises during non-instructional time.  FFA is listed both on the

official OHS website and in the OHS student handbook.  FFA is listed and pictured in the OHS

yearbook.  *See* Exhibit J to *First Amended Complaint*.   FFA activities are not actually taught in a

regularly offered course and do not concern the curriculum as a whole.  Participation in the

group is not required for a particular course and does not result in academic credit.  YG2 at 4(e).

The only federal court to address the question has held that a Future Farmers of America

organization at a school is a non-curricular student group under a *Mergens* Equal Access Act

analysis.[17]

     <u>Finance Academy</u>:  During the 2006-07 school year, OHS has recognized the Finance

Academy and permitted it to meet, engage in activities, use school resources, and otherwise

---

[16] *Randall v. Pegan*, 765 F. Supp. 793 n.12 (W.D.N.Y.1991); *Garnett v. Renton School Dist.*,
772 F.Supp. 531, 534 (W.D.Wash.1991), *rev'd* on other grounds, 987 F.2d 641 (9th Cir.1993),
*cert*. denied, 510 U.S. 819, 114 S.Ct. 72, 126 L.Ed.2d 41 (1993), on remand, 1994 WL 555397
(W.D.Wash.1994), appeal after remand, 21 F.3d 1113, 1994 WL 134272 (9th Cir.1994) (Table,
Text in Westlaw); *but cf. East High Gay/Straight Alliance v. Board of Educ. of Salt Lake City
School Dist.*, 30 F. Supp.2d 1356 (D.Utah 1998)(FBLA is directly related to curriculum).
[17] *Randall v. Pegan*, 765 F. Supp. 793 n.12 (W.D.N.Y.1991).

enjoy school privileges on school premises during non-instructional time.  Finance Academy is listed both on the official OHS website and in the OHS student handbook.  Finance Academy  is listed and pictured in the OHS yearbook.  *See* Exhibit J to *First Amended Complaint*.  Finance is not actually taught in a regularly offered course and does not concern the curriculum as a whole.  Participation in the group is not required for a particular course and does not result in academic credit.  YG2 at 4(f).

Heath Occupations Students of America:  During the 2006-07 school year, OHS has recognized HOSA and permitted it to meet, engage in activities, use school resources, and otherwise enjoy school privileges on school premises during non-instructional time.  HOSA listed both on the official OHS website and in the OHS student handbook.  HOSA is listed and pictured in the OHS yearbook.  *See* Exhibit J to *First Amended Complaint*.  HOSA activities are not actually taught in a regularly offered course and do not concern the curriculum as a whole.  Participation in the group is not required for a particular course and does not result in academic credit.  YG2 at 4(g).

Key Club:  During the 2006-07 school year, OHS has recognized the Key Club and permitted it to meet, engage in activities, use school resources, and otherwise enjoy school privileges on school premises during non-instructional time.  Key Club is listed both on the official OHS website and in the OHS student handbook.  Key Club is listed and pictured in the OHS yearbook.  *See* Exhibit J to *First Amended Complaint*.  Key Club is a community service organization.  Key Club activities are not actually taught in a regularly offered course and do not concern the curriculum as a whole.  Participation in the group is not required for a particular course and does not result in academic credit.  YG2 at 4(h).  A court that has examined the

question has found that the presence of a Key Club at a public high school creates a limited open forum under the Equal Access Act.[18]

Student Council:  During the 2006-07 school year, OHS has recognized the Student Council and permitted it to meet, engage in activities, use school resources, and otherwise enjoy school privileges on school premises during non-instructional time.  Student Council is listed both on the official OHS website and in the OHS student handbook.  Student Council activities are not actually taught in a regularly offered course and do not concern the curriculum as a whole.  Participation in the group is not required for a particular course and does not result in academic credit.  Student Council does not address concerns, solicit opinions, or formulate proposals pertaining to the body of courses offered by the school.  The function of the Student Council is to plan social events such as Prom and Homecoming.  YG2 at 4(i).   Where the primary activity of the student council is to plan social events, rather than participate in planning the school's curriculum, and where no academic credit is awarded for participation in student council, courts have held that student council is not directly related to the school's curriculum and creates a limited open forum under the Equal Access Act.[19]

Class of 2007: During the 2006-07 school year, OHS has recognized the Class of 2007 Club and permitted it to meet, engage in activities, use school resources, and otherwise enjoy

---

[18] *Pope v. E. Brunswick Bd. of Educ.*, 12 F.3d 1244, 1253 (3d Cir.1993).

[19] In *Mergens*, the Supreme Court stated that "[a] school's student government would generally relate to the curriculum to the extent that it addresses concerns, solicits opinions, and formulates proposals pertaining to the body of courses offered by the school." 496 U.S. at 240.  In *White County High School Peers Rising in Diverse Education v. White County School District*, 2006 WL 1991990,*7 (N.D.Ga.2006), the court stated that where the "actual subject matter of Student Council is raising student concerns with regard to facilities and planning noncurricular activities such as the Homecoming Dance, the Spring Dance, class t-shirt sales, and fundraisers," then the group is non-curricular and creates a limited open forum.  *See also Boyd*, 258 F. Supp. 2d at 687 (executive councils are non-curricular).

school privileges on school premises during non-instructional time.  Class of 2007 club is listed in the official OHS student handbook.  Class of 2007 activities are not actually taught in a regularly offered course and do not concern the curriculum as a whole.  Participation in the group is not required for a particular course and does not result in academic credit.  YG2 at 5(j).

Class of 2008: During the 2006-07 school year, OHS has recognized the Class of 2008 Club and permitted it to meet, engage in activities, use school resources, and otherwise enjoy school privileges on school premises during non-instructional time.  Class of 2008 club is listed in the official OHS student handbook.  Class of 2008 activities are not actually taught in a regularly offered course and do not concern the curriculum as a whole.  Participation in the group is not required for a particular course and does not result in academic credit.  YG2 at 5(k).

Class of 2009: During the 2006-07 school year, OHS has recognized the Class of 2009 Club and permitted it to meet, engage in activities, use school resources, and otherwise enjoy school privileges on school premises during non-instructional time.  Class of 2009 club is listed in the official OHS student handbook.  Class of 2009 activities are not actually taught in a regularly offered course and do not concern the curriculum as a whole.  Participation in the group is not required for a particular course and does not result in academic credit.  YG2 at 5(l).

Majorettes: During the 2006-07 school year, OHS has recognized the Majorettes and permitted it to meet, engage in activities, use school resources, and otherwise enjoy school privileges on school premises during non-instructional time.  The Majorettes are listed in the official OHS student handbook.  The Majorettes are listed and pictured in the OHS yearbook.  *See* Exhibit J to *First Amended Complaint*.  Majorettes activities, which the yearbook depicts as baton twirling and synchronized dancing, are not actually taught in a regularly offered course

and do not concern the curriculum as a whole.  *Id*.  Participation in the group is not required for a particular course and does not result in academic credit.  YG2 at 5(m).

Poetry Club:   During the 2006-07 school year, OHS has recognized the Poetry Club and permitted it to meet, engage in activities, use school resources, and otherwise enjoy school privileges on school premises during non-instructional time.  *See Declaration of Todd Holt*, attached as Exhibit H.  The Poetry Club is listed in the official OHS student handbook.  Poetry is not actually taught in a regularly offered course and does not concern the curriculum as a whole. Participation in the group is not required for a particular course and does not result in academic credit.  YG2 at 5(n).

Fellowship of Christian Athletes:  OHS has granted access to the Fellowship of Christian Athletes in past years and continuing into the 2006-07 school year.  FCA is granted access in the form of listing in the 2006-07 official OHS student handbook.  FCA is further granted access in the form of listing on the official OHS website as of the filing of the complaint in this matter on November 15, 2006.  FCA is regularly photographed in the OHS yearbook.  *See* Exhibit J to *First Amended Complaint*.  Christian fellowship is not actually taught in a regularly offered course and does not concern the curriculum as a whole.  Participation in the group is not required for a particular course and does not result in academic credit.[20]

Non-curricular sports groups:  OHS grants access to several sporting organizations. These include baseball; basketball; bowling; cheerleading; cross country; flag football; football; golf; rodeo; soccer; softball; swimming; and tennis; track; volleyball; weightlifting; and wrestling.  At

---

[20] Defendants may contend that the FCA has disbanded due to lack of interest.  This does not, however, change the fact that FCA has been granted actual access and used that access in the form of OHS advertising during the 2006-07 school year.

least some of these sporting activities are not taught in any regularly scheduled class, do not concern the body of courses as a whole, do not generate any academic credit, and are not required for any class.  No class requires participation in any sport.  The only federal appellate court to examine the question has held, under similar facts where none of the *Mergens* factors for curriculum relation were met, that a cheerleading team is a non-curricular student group creating a limited open forum under the Equal Access Act.[21]  A federal district court has held that a bowling team is an extracurricular student group.[22]  One recent district court expressed doubt that extracurricular sport teams and cheerleading teams could be considered "curriculum-related" where, as here, sports and cheerleading were not taught as part of the curriculum and no credit was earned by participating.[23]

OHS grants access to many clubs and organizations not directly related to the school's curriculum.  Therefore, unless it meets one of the exceptions set forth in the Equal Access Act, it must grant access and recognition to the GSA.  Principal Wiersma did not invoke any of the statutory exceptions that sometimes allow a school to deny access to certain groups; she relied solely on her assertion that the EAA did not govern OHS because of the number (too many or none at all) of clubs at OHS.  To the extent that defendants may now try to assert some other justification for  the unequal treatment of the GSA, these arguments are addressed here.

---

[21] *Straights and Gays for Equality (SAGE) v. Osseo Area Schools-District* , --- F.3d ----, 2006 WL 3751569, *3-4 (8th Cir. December 22, 2006).

[22] *Garnett v. Renton School Dist*., 772 F.Supp. 531, 534 (W.D.Wash.1991), *rev'd* on other grounds, 987 F.2d 641 (9th Cir.1993), *cert*. denied, 510 U.S. 819, 114 S.Ct. 72, 126 L.Ed.2d 41 (1993), on remand, 1994 WL 555397 (W.D.Wash.1994), appeal after remand, 21 F.3d 1113, 1994 WL 134272 (9th Cir.1994) (Table, Text in Westlaw).

[23] *White County High School Peers Rising in Diverse Education v. White County School District*, 2006 WL 1991990 (N.D.Ga.2006).

C.      *Defendants' Post Hoc Justifications Are Unavailing.*

1.      <u>The denial of equal access to the GSA is not justified by abstinence policies</u>.

Despite the fact that the only justification that Principal Wiersma has ever claimed for

denying access to the Okeechobee GSA was that the EAA did not govern OHS because of the

number of clubs at OHS, Defendants have come up with *post hoc* justifications in the press and

their Motion to Dismiss that they now claim allow for unequal treatment of the GSA.  One

justification offered is that Florida law and school board policy mandate "abstinence-only"

education.

Florida law regarding HIV education requires schools to teach abstinence outside of

marriage.  *Fla. Stat.* 1003.46(2)(a) and (b) read:

(2)     Throughout instruction in acquired immune deficiency syndrome, sexually
        transmitted diseases, or health education, when such instruction and
        course material contains instruction in human sexuality, a school shall:

        (a)     Teach abstinence from sexual activity outside of marriage
                as the expected standard for all school-age students while
                teaching the benefits of monogamous heterosexual
                marriage.

        (b)     Emphasize that abstinence from sexual activity is a certain
                way to avoid out-of-wedlock pregnancy, sexually
                transmitted diseases, including acquired immune deficiency
                syndrome, and other associated health problems.

Defendants take the tortured position in their motion to dismiss that this statute means

that they can ban any group that discusses harassment and discrimination against the gay and

lesbian community and tolerance of all individuals regardless of sexual orientation.  Defendants

are wrong.

Defendants mistakenly rely on one district court decision.  In *Caudillo v. Lubbock*

*Independent Sch. District*, 311 F. Supp.2d 550 (N.D.Tex. 2004), the district court held that the defendant school district could permissibly deny access to a gay-straight student group where the stated purpose of the gay-straight association there was to discuss sexual topics and where the group sought to promote its website that provided access to obscene, indecent, and lewd sexual material through flyers and announcements on the public address system.  The court concluded that under those circumstances, the school's abstinence-only policy and the state law at the time criminalizing same-sex sexual relationships justified the exclusion.

        *Caudillo* is factually distinguishable and legally irrelevant here.  *Caudillo* relied heavily in its reasoning on the fact that, at the time the group applied for recognition, Texas law criminalized same sex intimate relationships.  In *Lawrence v. Texas*, 539 U.S. 558 (2003), however, the United States Supreme Court declared Texas' sodomy law unconstitutional.  Of course, Florida does not and could not now criminalize consensual gay intimate relationships, so at the outset, the legal underpinning of the *Caudillo* decision militates against its application here.

        *Caudillo* is also factually distinguishable because the Okeechobee GSA's purpose and activities do not conflict in any way with either OHS' abstinence-only policy or with Florida state law.  In *Caudillo*, the gay-straight association's stated goal included "to educate willing youth about safe sex . . .."  More importantly to the court, the group sought to distribute flyers and make announcements on the school's public address system promoting its website, which contained links to obscene, indecent, and lewd sexual material meant for adults.  None of these facts are present here.  The purpose of the Okeechobee GSA is to provide a safe, supportive environment for students to talk about homophobia and related harassment and violence and to

work together to promote tolerance, understanding, and acceptance of one another, regardless of sexual orientation.  The group simply does not address or discuss sex in any context, gay or straight at their meetings.  The topic is not part of the Okeechobee GSA's purpose.  Thus, allowing equal access to the Okeechobee GSA is not inconsistent with Okeechobee's abstinence-only curriculum or Florida state law. [24]

Not only is there no conflict between the purpose of the GSA and "abstinence only" policies, but the GSA goals are consistent with the educational goals of the State of Florida. The Florida Department of Education has promulgated regulations that specifically recognize the problem of anti-gay violence and harassment and direct schools to involve students in finding a solution.   Florida State Board of Education Rule 6A-1.0404 states that

> it is essential that schools be safe and orderly to provide environments that foster learning and high academic achievement. Goal Five of the state education goals (Section 229.591(3)(e), Florida Statutes) calls for communities to provide an environment that is drug-free and protects students' health, safety, and civil rights. The goal emphasizes the personal responsibility of students and the necessity of involving all stakeholders, including parents, in achieving this goal.

In recognition of the fact that anti-gay violence is a problem in Florida schools, this provision authorizes schools to impose more severe consequences when a violation of the student code of conduct is motivated by anti-gay bias.  Rule 6A-1.0404(5).   Florida Department of Education regulations prohibit any individual from discriminating against or harassing any student based

---

[24]   The age range of the students in *Caudillo* as compared with OHS further distinguishes the facts of the two cases: the *Caudillo* court relied upon the fact that in that case, the school in question included middle school students as young as twelve years old.  The opposite is true here.  OHS is comprised of grades ten through twelve.  Middle school students attend classes at different campuses, and even freshmen high school students attend classes at another campus. OHS students are older and more mature than the students in *Caudillo*, making that court's analysis even less applicable here.

upon her sexual orientation, and subjects a licensed educator to discipline for doing so.  *See* State

Board of Education Code of Ethics Rule 6B-1.006.

So, the GSA at OHS furthers Florida's educational policies; it does not conflict with

them.

In addition to being factually distinguishable, *Caudillo* should have no bearing on this

case because that court's reliance on the school's abstinence-only policy as a justification for

squelching student speech departs radically from the express requirements of the Equal Access

Act.  The Act bars schools from denying equal access or fair opportunity to, and from

discriminating against, any student groups "on the basis of the religious, political, philosophical,

or other content of the speech . . . ."  20 U.S.C. 4071(a).  This statutory language ensures equal

access for all non-curricular student groups regardless of whether the group engages in speech

that is consistent with what the school teaches.  The Equal Access Act does not permit a school

to stifle intellectual debate and discussion by shutting down any student group that disagrees

with any curricular material.  *See Tinker v. Des Moines Independent Community Sch. Dist*., 393

U.S. 503, 511(1969)("In our system, students may not be regarded as closed-circuit recipients of

only that which the State chooses to communicate. They may not be confined to the expression

of those sentiments that are officially approved."); *Colin v. Orange Unified School Dist*., 83 F.

Supp.2d 1135, 1140 (C.D.Cal. 2000) (even if the subject matter discussed in the GSA club was

taught in a regularly scheduled course, that would not justify denial of equal access to GSA). [25]

For example, under the EAA, a school could not deny equal access to a group of students

---

[25] The First Amendment also does not permit OHS to engage in viewpoint discrimination that would allow OHS to censor otherwise appropriate student speech based on the student's disagreement with the school's curriculum.  *See First Amended Complaint*.

who want to form a club to discuss creationism on the basis that their speech is inconsistent with

the science curriculum that teaches evolution as the explanation of how the earth was formed.

Nor does the EAA allow OHS to deny equal access to the GSA based on the fact that it may

express views that are inconsistent with those of the school.

2.    Granting GSA Access Will Not Materially And Substantially Interfere With The
      Orderly Conduct Of Educational Activities At OHS, Limit OHS' Ability to
      Maintain Order and Discipline, or Limit OHS' Ability to Protect the Well-Being
      of Its Faculty or Students.

Principal Wiersma's justification for denying access to the Okeechobee GSA was her

plainly inaccurate assertion that OHS does not allow any non-curricular student group to meet on

campus or the legally irrelevant assertion that there are already too many.  To the extent that

defendants may now try to justify their conduct by asserting that the presence of the Okeechobee

GSA on the OHS campus would materially and substantially interfere with the orderly conduct

of educational activities at OHS, limit OHS' ability to maintain order and discipline, or limit

OHS' ability to protect the well-being of its faculty or students, these arguments must fail.

In *Boyd County High Sch. Gay Straight Alliance v. Bd. of Educ.,* 258 F. Supp. 2d 667,

685-86 (E.D. Ky. 2003), the school district advanced similar arguments.  In that case, students

protesting the existence of a gay-straight group on campus organized school boycotts, walk-outs,

and protests outside the school.  The defendant school district argued that the upheaval caused on

campus by the protesting students justified the exclusion of the gay-straight group from the

school.  The court in *Boyd* rejected this argument.  The court first found that the Equal Access

Act mirrors the "material disruption" standard set forth by the United States Supreme Court in

29

*Tinker v. Des Moines Independent Community Sch. Dist.*, 393 U.S. 503  (1969).[26]  Then, citing

the prohibition against the "heckler's veto" set forth in *Terminiello v. Chicago*, 337 U.S. 1

(1949), the court found that because the GSA students did not engage in any disruptive behavior

themselves, and because every student who did go to class was able to learn without any

interruption in the lessons, that the disruption caused by the protesting students did not justify

denying access to the GSA.

Here, there is even less justification for denying access to the GSA.  There is simply no

evidence that the GSA's presence at OHS would cause any disruption at all at OHS.  GSA

members themselves have not engaged in any disruptive behavior at all.

Indeed, any potential disruption at OHS caused by people protesting the GSA would be

caused by the actions of Wiersma and Cooper themselves.    In an article appearing in the

*Florida Baptist Witness*, Superintendent Cooper stated she and Wiersma asked members of the

local ministerial alliance, including Randy Huckbee, pastor of First Baptist Church in

Okeechobee, to meet with them in Cooper's office shortly after the announcement that a lawsuit

had been filed to discuss strategy for thwarting the GSA students.  As a result of that strategy

session, Huckbee has instructed OHS students who attend his church to adopt a "proactive

posture" "by standing up and saying, 'I'm not going to be involved.'"[27]   Huckbee's statements

show that he directed students to protest after meeting with Cooper and Wiersma in Cooper's

office. Cooper and Wiersma may not now rely on the disruption that they themselves incited by

---

[26] Other courts have reached the same conclusion:  *Colin*, 83 F. Supp. 2d at 1141; *Hsu*, 85 F.3d at 857 (2d Cir. 1996).
[27] *See* Joni Hannigan, *Superintendent says homosexual club would violate Okeechobee district's abstinence-only curriculum*, Florida Baptist Witness, December 7, 2006, a true and correct transcription attached as Exhibit F.

calling the meeting with the ministers in order to justify their own unlawful conduct.

Reliance on *Caudillo* here would be misplaced as well. The *Caudillo* court found that the presence of the gay-straight group there would materially and substantially interfere with the orderly conduct of educational activities at the school, limit the school's ability to maintain order and discipline, or limit the school's ability to protect the well-being of its faculty or students. There the court found that the defendant school district could invoke these exceptions to the access demanded by the Equal Access Act because the group in that case discussed sexual conduct including same-sex sexual conduct which, at that time, was criminalized in Texas, and because the group promoted lewd, obscene, and indecent material, which was also illegal.

Here, *Caudillo* does not control. None of the facts that justified application of the exceptions to the Equal Access Act there are present here. There is no evidence that the Okeechobee GSA has undertaken any inappropriate or unlawful activity. Simply put, the conclusion reached in *Caudillo* must be limited to its unique facts. Those facts are not present here.

Because, during the 2006-07 school year, Defendants have permitted at least one non-curricular group to meet on school premises during non-instructional time, they must permit the Okeechobee GSA to do so on equal terms. No EAA exception excuses compliance here. Thus, Plaintiffs are substantially likely to succeed on the merits of their claim under the EAA.

II.    THERE IS A SUBSTANTIAL THREAT OF IRREPARABLE INJURY IF THE
       REQUESTED PRELIMINARY INJUNCTIVE RELIEF IS NOT GRANTED.

As the Supreme Court has long held, "[t]he loss of First Amendment freedoms, for even

minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427

U.S. 347, 373 (1976) (citation and footnote omitted).[28]  Courts have similarly held that the

deprivation of the statutory rights guaranteed by the EAA is an irreparable injury: "The EAA

protects free speech rights . . . . [T]he Act protects 'expressive liberties,' and we therefore take

guidance from the Supreme Court's oft-quoted statement that the loss of First Amendment

freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Hsu*,

85 F.3d at 872 (quotation omitted).[29]

In this case, Plaintiffs are not suffering merely threatened injury; they are suffering actual

irreparable injury.  With every passing day that Defendants deprive Plaintiffs of the

constitutional right to expressive association guaranteed by the First Amendment and the

statutory rights guaranteed by the EAA, Plaintiffs suffer injury for which they cannot be made

whole.[30]

---

[28] *See also Bennett v. Hendrix*, 423 F.3d 1247, 1254 (11th Cir. 2005); *N.E. Fla. Ch. of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990); *Newman v. City of E. Point*, 181 F. Supp. 2d 1374, 1381 (N.D. Ga. 2002); *NAF v. MARTA*, 112 F. Supp. 2d 1320, 1328 (N.D. Ga. 2000); *Atlanta J. & Const. v. City of Atlanta Dep't of Aviation*, 6 F. Supp. 2d 1359, 1366 (N.D. Ga. 1998); *ACLU of Ga. v. Miller*, 977 F. Supp. 1228, 1235 (N.D. Ga. 1997); *Tillman v. Miller*, 917 F. Supp. 799, 801 (N.D. Ga. 1995); *Smith v. Turner*, 764 F. Supp. 632, 642 (N.D. Ga. 1991); *Chabad-Lubavitch of Ga. v. Harris*, 752 F. Supp. 1063, 1066 (N.D. Ga. 1990).

[29] *See also Boyd*, 258 F. Supp. 2d at 692; *Colin*, 83 F. Supp. 2d at 1149.

[30] *See also Boyd*, 258 F. Supp. 2d at 692; *Colin*, 83 F. Supp. 2d at 1150.

III.    THE THREATENED INJURY TO PLAINTIFFS OUTWEIGHS THE HARM THAT
        THE REQUESTED PRELIMINARY INJUNCTIVE RELIEF MAY CAUSE
        DEFENDANTS.

        The deprivation of the constitutional right to free expression is an especially acute injury.

*See* § II. *supra*.  The constitutional dimension to the ongoing injury in this case alone weighs

heavily in favor of Plaintiffs.[31]

        Even more dispositively, the requested preliminary injunctive relief would cause

Defendants no harm at all.  The requested preliminary injunctive relief would not compel

Defendants to do anything beyond passive accommodation.  It would compel Defendants only to

permit the Okeechobee GSA and other non-curricular groups to meet, and to do so on equal

terms.  In doing so, it would compel Defendants to do nothing beyond what thousands of other

school districts and their officials do with regard to non-curricular clubs, and, indeed, what they

themselves have done during the 2006-07 school year with regard to non-curricular clubs.[32]

        Moreover, given the significant educational value of extracurricular activities, the

requested preliminary injunctive relief would allow Defendants to provide a more optimal

educational environment for their students. In sum, the actual injury to Plaintiffs vastly

outweighs any harm that the requested preliminary injunctive relief might cause Defendants.[33]

---

[31] *Newman*, 181 F. Supp. 2d at 1381; *NAF*, 112 F. Supp. 2d at 1328; *Atlanta J. & Const.*, 6 F. Supp. 2d at 1366; *ACLU of Ga.,* 977 F. Supp. at 1235.

[32] The only "harm" to which Defendants may point is societal disagreement with Okeechobee GSA's viewpoint.  This "harm," however, is not a constitutionally cognizable harm.  *Johnson*, 491 U.S. at 414.

[33] *See Boyd*, 258 F. Supp. 2d at 692; *Seidel*, 95 F. Supp. 2d at 1251; *Colin*, 83 F. Supp. 2d at 1150.

IV.     GRANTING THE REQUESTED PRELIMINARY INJUNCTIVE RELIEF WOULD
        NOT DISSERVE THE PUBLIC INTEREST.

        The public interest is always furthered where the constitutional and statutory right to free

expression is safeguarded.  "No long string of citations is necessary to find that the public

interest weighs in favor of having access to a free flow of constitutionally protected speech."

*ACLU of Ga.*, 977 F. Supp. at 1235 (quotation omitted).[34]

        Moreover, anti-gay harassment in schools is a serious problem.[35]  This harassment

undermines the very mission of OHS – to provide an educational environment in which all

students have a full and fair opportunity to learn.  The requested preliminary injunctive relief

would further the public interest because Okeechobee GSA is intended, among other things, to

empower its members to seek to eradicate anti-gay harassment at OHS.

        Furthermore, extracurricular activities have significant educational value.[36]  The

requested preliminary injunctive relief would further the public interest by ensuring a more

optimal educational environment for OHS students.  For all of these reasons, granting the

---

[34] *See also Suntrust Bank v. Houghton Mifflin Co.,* 268 F.2d 1257, 1276 (11th Cir. 2001);
*Newman*, 181 F. Supp. 2d at 1381; *NAF*, 112 F. Supp. 2d at 1328; *Atlanta J. & Const.,* 6 F. Supp.
2d at 1366.

[35] Susan Hanley Kosse & Robert H. Wright, *How Best to Confront the Bully: Should Title IX or
Anti-Bullying Statutes Be the Answer?*, 12 Duke J. of Gender L. & Policy, 53, 56 (2005)
(reporting that 84% of gay students suffer verbal, and 40% suffer physical, harassment because
of their sexual orientation).

[36] *See also Bd. of Educ. v. Earls*, 536 U.S. 822, 831 n.4 (2002) ("Participation in such
extracurricular activities is a key component of school life, essential in reality for students
applying to college, and, for all participants, a significant contributor to the breadth and quality
of the educational experience.") (quotation omitted); *Pope*, 12 F.3d at 1254 ("[W]ip[ing] out all
of [a school's] noncurriculum related student groups and totally clos[ing] its forum . . . . may be
antithetical to progressive concepts of education."); *Colin*, 83 F. Supp. at 1143 ("[C]lubs
participate in the intellectual give and take of campus debate.") (quotation omitted).

requested preliminary injunctive relief would significantly further the public interest.[37]

CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court grant the requested preliminary injunctive relief.

Respectfully Submitted

s/Robert F. Rosenwald, Jr.

_____
Robert F. Rosenwald, Jr. (Fla. Bar No.: 0190039)
RRosenwald@aclufl.org
Randall C. Marshall (Fla. Bar No.: 0181765)
RMarshall@aclufl.org
American Civil Liberties Union Foundation of Florida
4500 Biscayne Blvd.,  Suite 340
Miami, Florida 33137
TEL:   (786) 363-2713
FAX:   (786) 363-1392

Attorneys for Plaintiffs

---

[37] *See Boyd*, 258 F. Supp. 2d at 692; *Seidel*, 95 F. Supp. 2d at 1251; *Colin*, 83 F. Supp. 2d at 1151.

**Certificate of Service**

I hereby certify that on January 11, 2007, I electronically filed the foregoing document with the Clerk of Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or *pro se* parties identified on the attached Service List in the manner specified, either by transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

s/Robert F. Rosenwald, Jr.

Robert F. Rosenwald, Jr.

**SERVICE LIST**
**Gay Straight Alliance of Okeechobee High Sch. vs. Sch. Bd. of Okeechobee County**
**Case No.: 06-14320-CIV-MOORE/LYNCH**
**United States District Court, Southern District of Florida**

David C. Gibbs III, Esq.
E-mail: dgibbs@gibbsfirm.com
Barbara J. Weller, Esq.
E-mail: bweller@gibbsfirm.com
Gibbs Law Firm, P.A.
5666 Seminole Blvd., Suite 2
Seminole, Florida 33772
TEL:   (727) 399-8300
FAX:   (727) 398-3907
Attorneys for Defendants School Board of Okeechobee County and Toni Wiersma

\\SERVER01\Users\RRosenwald\My Documents\Gonzalez Yasmin\PI MEMO OF LAW (22).doc