# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 06-14320-Civ-Moore/Lynch

GAY-STRAIGHT ALLIANCE OF
OKEECHOBEE HIGH SCHOOL, et al.,

     Plaintiffs,

vs.

SCHOOL BOARD OF OKEECHOBEE
COUNTY,

     Defendant.

_____ /

**DEPOSITION OF: DR. PATRICIA COOPER**

DATE:            December 11, 2007

TIME:            9:00 a.m. to 1:30 p.m.

PLACE:           410 NW 6th Street
                 Okeechobee, Florida

TAKEN BY:        Amy J. Schreck, Registered Professional
                 Reporter and Notary Public, State of Florida
                 at Large

APPEARANCES:
FOR PLAINTIFFS:      Robert Rosenwald, Jr., Esquire
                     American Civil Liberties Union
                     4500 Biscayne Boulevard, Suite 340
                     Miami, Florida 33137
                     (786) 363-2713

                     Ken Choe, Esquire
                     American Civil Liberties Union
                     125 Broad Street, 18th Floor
                     New York, New York 10004
                     (212) 549-2553

 1   AND THEREUPON,

 2                    **DR. PATRICIA COOPER**

 3   called as a witness on behalf of the Plaintiffs herein,

 4   after having been first duly sworn, was examined and

 5   testified as follows:

 6                    **DIRECT EXAMINATION**

 7   BY MR. ROSENWALD:

 8       Q    Before we open, my name is Rob Rosenwald.   I

 9   am the attorney for the Gay-Straight Alliance of

10   Okeechobee High School and for Yasmin Gonzalez who are

11   Plaintiffs in this case.  Let me just ask you some

12   general questions, give a few instructions.

13           Have you ever had your deposition taken

14   before?

15       A    No.

16       Q    I'm your sure attorney has explained it to

17   you but I'm going to be asking you questions and you'll

18   give me full and complete answers.  The court reporter

19   needs to hear what you're going to say, so speak out

20   loud and don't nod or say "uh-huh," and if you do

21   either, your attorney or me or the court reporter will

22   tell you that you need to speak up.

23           I just want to make sure that you understand

24   today when I refer to you, when I say "you," I mean to

25   include not only you but anyone else on behalf of the

1   Defendant in this case which is the School Board of

2   Okeechobee County except if I say expressly otherwise.

3        So if I say you personally, for instance,

4   that might be an exception.  If I refer to the

5   Defendant, I mean the School Board, the School

6   District, the High School or any agent thereof.  The

7   same holds true if I say SBOC.  I'll use that

8   abbreviation throughout this deposition.

9        I'm going to show you what I'm going mark as

10  Cooper 1 and I will represent to you that this -- our

11  notice of deposition for a 309(b)(6) deposition.  I'd

12  like to you look briefly at these topics and tell me if

13  you were the person designated to testify on behalf of

14  the School Board of Okeechobee County on these topics.

15       A    (The witness reviewed the document.)  Yes, I

16  am.

17                       (Cooper Exhibit Number 1 was marked

18                        for identification.)

19  BY MR. ROSENWALD:

20       Q    Dr. Cooper, is Okeechobee High School a

21  public secondary school?

22       A    Yes, it is.

23       Q    Since the start of the 2006/2007 school year,

24  has Okeechobee High School received Federal financial

25  assistance?

1      A      Yes, it has.

2      Q      Since the start of 2006/2007 school year,

3  have one or more non-curricular student groups been

4  permitted to meet on School premises during

5  non-instructional time at Okeechobee High School?

6      A      Would you explain "non-curricular"?

7      Q      Do you have an understanding of what

8  "non-curricular" means?

9      A      I had an initial understanding, but would you

10  clarify it for me so I make sure I understand?

11      Q      Tell me what your understanding of

12  "non-curricular" is.

13      A      "Non-curricular" would be anything not

14  related directly or indirectly to a curriculum.

15      Q      Using that definition, since the start of the

16  2006/2007 school year, have one or more non-curriculum

17  student groups been permitted to meet on school

18  premises during non-instructional time at Okeechobee

19  High School?

20      A      Yes.

21      Q      Absent a court order requiring Defendant to

22  do so, would Defendant permit the Plaintiff,

23  Gay-Straight Alliance of Okeechobee High School, to

24  meet on Okeechobee High School premises during

25  non-instructional time?

```
 1        A     We did not.

 2        Q     And is the group meeting this year?

 3        A     Yes, it is.

 4        Q     Would you permit them to meet absent a court

 5   order to do so?

 6        A     My opinion?

 7        Q     No.  The School Board -- on behalf of the

 8   School Board, would the School Board allow the

 9   Okeechobee GSA to meet this year if there was no court

10   order in effect right now ordering you to do so?

11        A     No.

12        Q     Is the Defendant the final decision-maker as

13   to the decision not to allow the Plaintiff,

14   Gay-Straight Alliance, to meet on school premises

15   during non-instructional times?

16        A     Correct.

17        Q     With regard to the decision to deny access to

18   the Gay-Straight Alliance at Okeechobee High School, is

19   the Defendant acting under color of State law?

20            MR. GIBBS:  Object.  It's a legal conclusion

21        that she's probably not aware what that means one

22        way or the other.  We've already got public school

23        Government money, but colored state law is a term

24        of art.

25            MR. ROSENWALD:  Let me just explain at this
```

ATLANTIC REPORTING
Stuart, Port St. Lucie, Fort Pierce,
Vero Beach and Okeechobee, Florida

1   not in the best interests of those students or if it is

2   something different than the actions of GSA and it's

3   more generally GSAs in general.

4           MR. GIBBS:  Objection to form.  Just for the

5       sake of speed, if you could tighten it up, a

6       little punchier, just like -- there's about eight

7       questions in there.

8   BY MR. ROSENWALD:

9       Q    Has the Okeechobee GSA itself done anything

10  to violate the SBOC abstinence only education policy?

11      A    Not to my knowledge.

12      Q    Has the Okeechobee GSA done anything through

13  its activities or its students to endanger the

14  well-being of any students at the School?

15      A    Not to my knowledge.

16      Q    Has the Okeechobee GSA done anything to

17  subject any students to a danger of STDs?

18      A    Not to my knowledge.

19      Q    Has the Okeechobee GSA acted in the way

20  through its student or its activity that would

21  interfere with the School's goal of preventing unwanted

22  teen pregnancy?

23      A    Not to my knowledge.

24           MR. GIBBS:  I should put one thing on the

25       record.  The Club has been operating under the

```
 1          If that is the case, then we really need to
 2     come to some resolution on that or get the Judge
 3     on the phone because we're not going to get done
 4     and it's unfair to me to have you sitting here
 5     testifying for her.
 6          MR. GIBBS:  We're not testifying.  I'm just
 7     making sure that your questions are not misleading
 8     or being put forward in a confusing manner where
 9     the witness is not understanding what you're
10     asking.
11          MR. ROSENWALD:  David, if the question is
12     confusing, you can object to the form of the
13     question.
14          MR. GIBBS:  And I am, yes.
15  BY MR. ROSENWALD:
16     Q    Has the Okeechobee GSA acting in its current
17  configuration done anything to interfere with parental
18  involvement in their students -- strike that.
19          Has the Okeechobee GSA in its current
20  configuration done anything through its activities to
21  interfere with discussions with parents about sexual
22  activities?
23     A    Not to my knowledge.
24     Q    Has the Okeechobee GSA done anything through
25  its activities or its students to cause harassment of
```

1    BY MR. ROSENWALD:

2        Q    Do you remember whether it was before or

3    after the filing of this lawsuit?

4        A    I don't remember.

5        Q    Was there a date when you made the decision

6    to deny access to the Okeechobee GSA?  Let me back up.

7             Do you make a decision to deny access to the

8    Okeechobee GSA?

9        A    Yes.

10       Q    You personally?

11       A    Yes.

12       Q    On behalf of the School Board?

13       A    Correct.

14       Q    What date was that?

15       A    I don't remember the date.

16       Q    Let me show you -- I'm going to show you what

17   I'm going mark as Cooper 2.  I'll give a copy to your

18   attorney as well.

19                        (Cooper Exhibit Number 2 was marked

20                         for identification.)

21   BY MR. ROSENWALD:

22       Q    Could you tell me what this is?

23       A    (The witness reviewed the document.)  It's a

24   letter from Principal Wiersma to Mr. Chris Stafford,

25   Attorney, regarding the formation of the GSA.

```
 1        Q     Who wrote the letter?

 2        A     It was jointly written between Mrs. Wiersma

 3   and me.

 4        Q     What date was it written?

 5        A     October 23rd, 2006.

 6        Q     Does this letter help refresh your memory at

 7   all as to the date when you denied access to the

 8   Okeechobee GSA?

 9        A     I would say yes.

10        Q     What date did you deny access to the

11   Okeechobee GSA?

12        A     I would say the date of this letter,

13   October 23rd, 2006.

14        Q     Now let me ask you, was this the date that

15   you decided to deny access to the GSA or was that made

16   at some point prior to sending the letter?

17        A     Prior to sending the letter.

18        Q     How far before sending the letter did you

19   decide to deny access?

20        A     A day or two.

21        Q     So some where around the 21st or the 22nd of

22   October 2006, you decided to deny access to the

23   Okeechobee GSA?

24        A     Correct.

25        Q     When you decided to deny access to the
```

1   Okeechobee GSA on October 22nd or 21st, 2006, had

2   Principal Wiersma told you that Steve Walker had told

3   her that he had visited the Okeechobee GSA web site?

4           MR. GIBBS:  Objection to form.  You can

5       answer if you understand.

6           THE WITNESS:  I don't recall when she shared

7       that with me.

8   BY MR. ROSENWALD:

9       Q    Well, do you recall whether the content of

10  the Okeechobee GSA web site was a specific factor in

11  your decision to deny access?

12      A    It was not.

13      Q    Tell me about the conversations between Steve

14  Walker and Principal Wiersma as they were related to

15  you.

16          MR. GIBBS:  Object to form.  Go ahead and

17      answer.

18          THE WITNESS:  Mr. Walker went to

19      Mrs. Wiersma's home and actually showed her the

20      site.

21  BY MR. ROSENWALD:

22      Q    When was that?

23      A    I don't know the date.

24      Q    Do you know generally when?

25      A    No, I don't.

1    Q    Is the SBOC aware of any hyperlink ever on

2  the Okeechobee GSA web site?

3    A    Not to my knowledge.

4    Q    So when you say "linked," and now we're using

5  a more generally linked, not hyperlinked, when you say

6  "linked to the national GSA," what do you mean by that?

7    A    The affiliation to GSA and the potential

8  communication through internet.

9    Q    With who in particular?

10    A    Any GSA clubs throughout the nation, adults

11  who may have access to that link -- that web site --

12  that could bring outside influences, possibly

13  inappropriate outside influences.

14    Q    Do other Okeechobee High School clubs

15  communicate with national umbrella organizations or

16  other school affiliations?

17    A    Yes.

18    Q    Why is it a problem in this case?

19    A    The potential for inappropriate materials,

20  the potential for outside adult influences on our

21  underage children regarding sexual activity, sexual

22  topics.

23    Q    Anything else?

24    A    No.

25    Q    Why do you think that the students of the

```
 1              The use of the Okeechobee High School logo

 2     without permission, was that a reason why the

 3     Okeechobee GSA was denied access to Okeechobee High

 4     School?

 5         A    No.

 6         Q    Is it a reason today?

 7         A    No.

 8         Q    When you denied access to the Okeechobee GSA,

 9     were you aware of any affiliation with any national

10     organizations and the Okeechobee High School GSA?

11         A    At the time of the question of the formation?

12         Q    Yes.

13         A    Not at that time.

14         Q    And at the time that you denied access to the

15     GSA, was there any -- were you aware of any affiliation

16     between the Okeechobee GSA and any other organization

17     whether national or otherwise?

18         A    Affiliation by name, yes.

19         Q    So other than the fact that the GSA called

20     itself the same name as other organizations of the same

21     name, were you aware of any communication between the

22     organizations?

23              MR. GIBBS:  Object to form.  You can go ahead

24          and answer.

25              THE WITNESS:  Not at that time.
```

```
 1   BY MR. ROSENWALD:

 2        Q    Are you aware now of any communication

 3   between those organizations and the Okeechobee GSA?

 4        A    Not specifically, no.

 5        Q    So as you sit here today, you are unaware of

 6   any communication between any outside organizations

 7   called a GSA whether nationally or another group and

 8   the Okeechobee GSA?

 9        MR. GIBBS:  I've got to object to form.  I

10        don't quite even know what we're asking.  I mean,

11        let me raise the issue just so if you're saying

12        are you aware that they're in communication with a

13        national office for some organization, she's

14        already testified that there were outside adults

15        some how in this process.  I don't know who or

16        what.

17        I'm just saying when you say "any

18        organization," if you say this guy has got his own

19        little corporation I don't know, but the whole

20        McCool issue and that is still being discussed.

21        What I'm trying to say is be more specific.

22        She is the corporate rep.  If you are asking, Are

23        you aware of any communication between them?  Yes,

24        they've been in contact with the ACLU which is

25        greatly limited communication from the School with
```

```
 1          clear, David.  If you testify again, I will stop

 2          the deposition.  I'm not going to sit here and

 3          have every time that she gives an answer that you

 4          don't like have her tell you what the answer

 5          should have been.

 6               MR. GIBBS:  There is no giving of any answer.

 7          The questions are so bad I'm not sure what the

 8          answer should be.  I'm familiar with the case.

 9   BY MR. ROSENWALD:

10        Q    Principal -- Dr. Cooper --

11               MR. GIBBS:  She's "Superintendent."

12   BY MR. ROSENWALD:

13        Q    Are you aware of any communications between

14   the Okeechobee GSA and anyone outside of the Okeechobee

15   GSA?

16        A    Yes.

17        Q    Who?

18        A    Mr. Eric McCool specifically.

19        Q    Anyone else?

20        A    No.

21        Q    Who is Eric McCool?

22        A    A former Okeechobee High student, a forty

23   year old man who I believe lives in Orlando.

24               MR. GIBBS:  I might again caution you, if you

25          know, don't guess.  I don't like to hear "might
```

1          live."  If you know, you know; if you don't, you

2          don't.

3     BY MR. ROSENWALD:

4          Q     Have you met Eric McCool?

5          A     No.

6          Q     Do you know if he is or was an OHS student?

7          A     Yes, he was.

8          Q     Do you know when he graduated?

9          A     No, I don't.

10         Q     Why did you point out that he was a 40 year

11    man?  What relevance is that?

12         A     An adult.

13         Q     What affiliation or communications do you

14    know of between the Okeechobee GSA and Eric McCool?

15         A     Mr. McCool was sharing with the students at

16    Okeechobee High School the opportunities and the ways

17    to form the GSA.

18         Q     Who told you that?

19         A     Principal Wiersma.

20         Q     When did she tell you that?

21         A     I don't recall.

22         Q     Are you personally -- Dr. Cooper -- aware of

23    any conversations between Eric McCool and

24    representatives of the GSA?

25         A     Not personally aware, no.

 1    a reason for you to deny access to the Okeechobee GSA?

 2            MR. GIBBS:  Object to form.  Go ahead and

 3        answer.

 4            THE WITNESS:  It validated my concern about

 5        the outside adult influence on our students.

 6    BY MR. ROSENWALD:

 7        Q    At the time you made the decision to deny

 8    access to the Okeechobee GSA, had Principal Wiersma

 9    told you that she knew of communications between Eric

10    McCool and the Okeechobee GSA?

11        A    No.

12        Q    So at the time you made the decision to deny

13    access to the Okeechobee GSA, were the communications

14    that Wiersma reported between Eric McCool and the

15    Okeechobee GSA one reason that you denied access to the

16    Okeechobee GSA?

17            MR. GIBBS:  Objection to form.  That's a very

18        long version of the question you just asked.

19            You can answer it again but she said no.

20            THE WITNESS:  Initially, no.  Again, it

21        validated dated my concern.

22    BY MR. ROSENWALD:

23        Q    Is there something specific about Eric McCool

24    that makes it inappropriate for him to communicate with

25    the GSA?

```
 1        A    Not him personally but the idea that adult
 2   influences on our students were happening.
 3        Q    Do you know if Eric McCool is gay or not?
 4        A    I do not.
 5        Q    Do you know if there was any improper content
 6   alleged in the communications between Eric McCool and
 7   the Okeechobee GSA?
 8        A    I do not.
 9        Q    Do you know who the communications were
10   between -- back up.  That was a bad question.
11             Do you know who on behalf of the Okeechobee
12   GSA communicated with Eric McCool?
13        A    I know that it was shared with me but it was
14   Yasmin Gonzalez.
15        Q    Who shared that with you?
16        A    Mrs. Wiersma.
17        Q    Do you know if Eric McCool runs a web site
18   design company?
19        A    I do not.
20        Q    Let's talk about the students of the GSA for
21   a minute.
22             Is there anything about any action of any
23   particular student involved in the GSA that led you to
24   deny access to the Okeechobee GSA?
25        A    No.
```

```
 1        Q    Is there anything about the disciplinary

 2   history of any of the particular students involved in

 3   the Okeechobee GSA that led you to deny access to the

 4   Okeechobee GSA?

 5        A    No.

 6        Q    Was there anything about any of these

 7   students who have ever been involved in the Okeechobee

 8   GSA that you claim would support your decision today to

 9   deny access to the Okeechobee GSA?

10        A    No.

11        Q    Do you know if Yasmin Gonzalez objected to

12   some policy relating to the 2006 prom?

13        A    Yes.

14        Q    Can you tell me about that?

15        A    Her objection was that she was denied a

16   couples' ticket.

17        Q    What did she do about it?

18        A    She went to the Principal at that time,

19   Mr. Kirsch.

20        Q    What happened?

21        A    She complained about being denied the

22   couples' ticket.

23        Q    What did Mr. Kirsch do?

24        A    The couple's ticket practice tradition was

25   changed so that there was no longer a couples' ticket.
```

1    Q    So when you say "exclude," you don't mean the

2   GSA is excluding students from its activities.

3   Correct?

4    A    Correct.

5    Q    What do you mean by "exclude"?

6    A    We have students who are 14 years old.  If

7   they read these bylaws and were yet unsure of their

8   sexual orientation, they could feel excluded.

9    Q    How?

10    A    The name of the Club -- Gay-Straight

11   Alliance -- denotes a student knowing his or her sexual

12   orientation.

13    Q    How does the purposes of the GSA denote that

14   anyone is one sexual orientation or even knows what

15   sexual orientation they are?

16    A    The focus on sexual orientation is at issue.

17    Q    Do you have to know that you're gay to be a

18   member of this Club?

19    A    No.

20    Q    Do you have to want to promote tolerance and

21   equality among students of all sexual orientations

22   according to the purposes of this Club?

23    A    According to the purpose, yes.

24    Q    Other than the facts that students who may

25   not know whether they're gay or straight might feel

```
 1    have identified?

 2         A    The inference of sexual orientation, in my

 3    opinion, denotes a violation of abstinence.

 4         Q    How?

 5         A    The identity of sexual orientation, in my

 6    opinion, is something that by inference denotes a lack

 7    of abstinence.

 8         Q    So are you saying that in order for -- strike

 9    that.

10              Anything else?

11         A    No.

12         Q    Has the Okeechobee GSA proposed any purpose

13    or activity that you feel would lead to sex?

14         A    Not to my knowledge.

15         Q    When you say there's an inference between a

16    lack of abstinence and the identification of sexual

17    orientation, are you saying that the identification of

18    a sexual orientation means that you necessarily are

19    having sex?

20              MR. GIBBS:  Object to form.

21              THE WITNESS:  No.

22    BY MR. ROSENWALD:

23         Q    Can gay students remain abstinent just as

24    much as straight students?

25         A    Yes.
```

1  Q Then why does the identification of sexual

2 orientation lead you to the conclusion that the Club

3 would cause a student to not be abstinent?

4  A The mandate, in my opinion, is that we teach

5 abstinence; we don't teach sexual orientation.

6  Q Are they inconsistent?

7  A What?

8  Q Are sexual orientation and abstinence

9 inconsistent?

10  A By definition?

11  Q Yes.

12  A No.

13  Q Then how does teaching abstinence and

14 discussion of sexual orientation inconsistent with each

15 other?

16  A The teaching of abstinence is mandated by

17 Florida Statute.  Discussion of sexual orientation is

18 something left to the family.  It's not something we

19 teach.

20  Q Anything else?

21  A No.

22  Q Is there any other reason the GSA is

23 inconsistent with the abstinence policy?

24  A No.

25  Q Besides the abstinence policy and its -- I

1      A     The Principal has to recommend the sponsor.

2      Q     Has that always been the policy at Okeechobee

3  High School?

4      A     As far as I know.

5                     (Cooper Exhibit Number 5 was marked

6                     for identification.)

7  BY MR. ROSENWALD:

8      Q     I'm going to show you what I will represent

9  to you in this case is a declaration of Toni Wiersma

10  and I'm going to point your attention to Paragraph 8.

11         Could you read that out loud?

12     A     "On October 10th, 2006, I was approached for

13  the first time by student Shakedra James about the

14  formation of a new student club at Okeechobee High

15  School.  I told her the students would need to find a

16  teacher adviser and draft a constitution for the new

17  club."

18     Q     Is that an accurate statement?

19     A     An accurate statement?

20     Q     Is it truthful as far as you know?

21     A     Yes.

22     Q     Was Mrs. Wiersma violating School Board

23  policy when she told the student to find a faculty

24  adviser?

25     A     The Principal ultimately recommends the

1    adviser or the sponsor.  The students may so list

2    teachers, but the Principal has the ultimate

3    responsibility of naming the sponsor or the adviser.

4         Q    Other than the purposes set forth in

5    Cooper -- I believe it was -- 4, the initial bylaws,

6    are there any other official understandings on the part

7    of SBOC as to purposes of the GSA?

8         A    No.

9         Q    As far as you know -- strike that.  Since the

10   Club has been allowed on campus, has the GSA done

11   anything inconsistent with these purposes?

12        A    Not to my knowledge.

13        Q    Anything that would broaden or expand these

14   purposes?

15        A    Not to my knowledge.

16        Q    Have any students ever indicated to anyone at

17   SBOC a desire to talk about sex at an Okeechobee GSA

18   meeting?

19        A    Reports that I have received, yes.

20        Q    From whom?

21        A    From Mrs. Wiersma.

22        Q    What does Mrs. Wiersma tell you?

23        A    That initially the topic was brought up but

24   the Club sponsor quickly diverted the discussion.

25        Q    Who was the Club sponsor?

1    in a GSA meeting?

2        A    Yes.

3        Q    Who was that student?

4        A    Yasmin Gonzalez.

5        Q    What did she say?

6        A    I don't know the particular topic.

7        Q    When you say "sexual activity," do you mean

8    actual sexual contact, not sexual orientation or am I

9    misunderstanding?

10            MR. GIBBS:  Object to form.

11            THE WITNESS:  Issues regarding sexual

12       activity and/or sexual orientation.

13   BY MR. ROSENWALD:

14       Q    Did any other student at any other time

15   express an interest in discussing sexuality?

16       A    Not to my knowledge.

17       Q    Did anyone other than Principal Wiersma tell

18   you that that anyone -- about any discussions of sex at

19   a GSA meeting?

20       A    No.

21       Q    Was the discussion that Mrs. Wiersma told you

22   about related to sexual orientation or sexual activity

23   or both?

24       A    I'm not sure.

25       Q    When was this conversation?

1        A      I don't know.

2        Q      Before the preliminary injunction, did any

3    student indicate a desire to talk about sex at an

4    Okeechobee GSA meeting?

5        A      I'm not sure.

6        Q      Did any of the students before the

7    preliminary injunction indicate an interest in

8    discussing sexuality?

9        A      Yes.

10       Q      Who?

11       A      Yasmin Gonzalez.

12       Q      What issue of sexuality did she propose

13   discussing?

14       A      I'm not sure of the details.

15       Q      Do you mean a discussion of sexual

16   orientation or a discussion of sex or something

17   different?

18       A      Anything regarding sexual activity of any

19   nature would be of concern.

20       Q      That's what I'm asking you.  Did she mention

21   sexual activity or a discussion about sexual

22   orientation in general?

23       A      I'm not sure.

24       Q      Earlier you testified that your decision to

25   deny access to the Okeechobee GSA was not based on the

```
 1   actions of any students at Okeechobee High School or in

 2   the Okeechobee GSA.

 3           Is this a change to that answer that you are

 4   now stating that the Okeechobee GSA is denied access

 5   based on Yasmin Gonzalez' discussion of sexual

 6   activity --

 7       A    No.

 8       Q    -- of the GSA meeting?

 9       A    No.

10           MR. GIBBS:  I'm late but I'm objecting to

11       form.

12   BY MR. ROSENWALD:

13       Q    Did any of the students who were proposing

14   the Okeechobee GSA say that they were having problems

15   with harassment against them?

16       A    Not to my knowledge.

17       Q    Did any of the students involved with the

18   Okeechobee GSA say that they were having emotional

19   problems that they hoped to address through the Club?

20       A    I'm not sure.

21       Q    Did any of the students who proposed having

22   the Okeechobee GSA say that they were personally having

23   any problems at all?

24       A    I'm not sure.

25       Q    Was it Defendant's understanding that the
```

1  students wanted to advocate for an end to harassment

2  against gay students generally or against them

3  personally?

4      A    Generally.

5      Q    Without telling me any students' sexual

6  orientation, was it the Defendant's understanding that

7  the Club was compromised gay students, straight

8  students or a mix of both?

9      A    Mix.

10      Q    Would the Club have been approved if it made

11  no mention of sexual orientation or didn't say the word

12  "gay"?

13          MR. GIBBS:  Object to form.

14          THE WITNESS:  An alternative club -- an

15      alternative to the name GSA was discussed and that

16      would have been approved.

17  BY MR. ROSENWALD:

18      Q    What name was that?

19      A    ADAPT.

20      Q    What does that stand for?

21      A    Accepting Diversity and Promoting Tolerance.

22      Q    Who came up with that name?

23      A    One of our school psychologists who is now

24  deceased.

25      Q    Who was that?

75

1      Q     What did he say to you?

2      A     He said, I think I have something that might

3    work and he mentioned ADAPT.

4            He said, This might be a solution.

5      Q     Why did he think that that might work?

6      A     Because the issues that seem to be of concern

7    were regarding tolerance, harassment, and he felt that

8    ADAPT might address those issues without the GSA

9    connection.

10     Q     If the Club had been called ADAPT instead of

11   GSA but had the exact same purposes outlined in

12   Cooper 4, would the Club have been approved?

13     A     No.

14     Q     So it's not the name of the Club.  It's the

15   purpose of the Club; is that right?

16           MR. GIBBS:  Object to form.

17           THE WITNESS:  The ADAPT name would have been

18        all-inclusive with no specificity as to sexual

19        orientation, gender identity and it would not have

20        been exclusive to all students.

21   BY MR. ROSENWALD:

22     Q     So I guess I go back to my original question.

23   Are you saying that the students would have needed to

24   remove any reference to gay people or sexual

25   orientation in order to get this Club approved?

```
 1              MR. ROSENWALD:  Sure.

 2              MR. GIBBS:  Why don't we do 15, then do a

 3         little break.

 4                        (There was a short break.)

 5    BY MR. ROSENWALD:

 6         Q    Dr. Cooper, does the presence of a GSA lead

 7    students to sexually explicit web sites?

 8         A    The presence of a GSA?

 9         Q    Yes.

10         A    Not just by their existence, no.

11         Q    Is there a concern -- is there any way that

12    the GSA might lead students to sexually explicit web

13    sites?

14         A    Yes.

15         Q    How so?

16         A    The national affiliation -- from what I

17    understand -- there are web sites.  We know that there

18    was a web site created for OHS GSA and that

19    connectivity might lead them to outside influences that

20    would not be in the best interests or for the

21    well-being of the students.

22         Q    Are you talking about any particular national

23    organization that you feel would possibly link kids to

24    objectionable material?

25         A    The sexually explicit activity of the GSA web
```

1      Q     And what is it about the presence of other

2   GSAs at other schools that might lead to students

3   accessing sexually explicit web sites -- if any?

4      A     It's my understanding from some of the

5   reading that I have done that GSAs communicate among

6   each other and that there are links -- internet

7   connectivity -- to outside influences that might lead

8   them to sexually explicit material, sexually explicit

9   sites that would influence our students.

10      Q     Has SBOC ever gone and researched other GSA

11   web sites?

12      A     The only knowledge I have is what I have done

13   in GSA in general.

14      Q     Have you ever gone to any other school's GSA

15   web site?

16      A     No.

17      Q     And just so we're clear, the Okeechobee GSA

18   web site you have never visited?

19      A     Correct.

20      Q     Is it your understanding that the Okeechobee

21   GSA web site has hyperlinks to any other organization?

22      A     No.

23      Q     Are SBOC students at Okeechobee High School

24   given access to computers for using the internet?

25      A     Yes.

1      Q     Are these computers equipped with filtering

2   software to filter sexually explicit materials?

3      A     Yes.

4      Q     Are the filters set to filter out gay and

5   lesbian topics?

6      A     I don't know.

7      Q     Are the computers that students have access

8   to any where on SBOC properly equipped up with pop-up

9   blockers?

10     A     Yes.

11     Q     Other than the reasons you've testified to

12  just now, is there anything else -- any other reason --

13  that the GSA might lead to inappropriate content?

14          MR. GIBBS:  Object to form.

15          THE WITNESS:  We believe it's our position

16     that sexually explicit discussions are best left

17     to the role of the parents.  It's not something

18     that we believe is a part of our position.

19  BY MR. ROSENWALD:

20     Q     Has the Okeechobee GSA ever proposed to have

21  a sexually explicit discussion?

22          MR. GIBBS:  Object as to form and asked and

23     answered.

24          THE WITNESS:  I believe I previously stated

25     that, yes, there was an approach of the topic but

1    the sponsor redirected the topic.

2   BY MR. ROSENWALD:

3    Q    I'm going to ask -- I'm trying to try and ask

4   you again because I don't think you were exactly

5   answering the question I was asking.

6         Is there anything else about a GSA that might

7   lead to inappropriate content on the internet other

8   than I believe you testified that the existence of

9   other GSAs at other schools?

10        There's nothing else.  Correct?

11   A    Not to my knowledge.

12   Q    Does the presence of a GSA at the school

13  interfere with any student's ability to seek

14  professional mental health counseling for any problems

15  they have related to bullying?

16   A    No.

17   Q    Does the presence of a GSA interfere with any

18  student's ability to seek professional mental health

19  counseling which they may have relating to bullying?

20   A    No.

21   Q    Does the presence of a GSA interfere with any

22  student's ability to seek professional mental health

23  counseling for they have may have relating to sexual

24  orientation?

25   A    No.

84

1   Q    Does the GSA decrease the efficacy of

2   professional mental health counseling if the student

3   does seek it relating to bullying?

4   A    Would you repeat that, please.

5   Q    Does the GSA decrease -- does the presence of

6   a GSA decrease the efficacy of professional mental

7   health counseling if a student does seek it regarding

8   bullying?

9   A    No.

10   Q    Does the presence of the GSA decrease the

11   efficacy of professional mental health counseling if

12   the student does seek it relating to sexual

13   orientation?

14   A    No.

15   Q    Does the presence of the GSA discourage

16   students to request professional mental health

17   counseling relating to bullying or sexual orientation

18   if they need it?

19   A    No.

20   Q    Did anyone at the SBOC on behalf of the

21   School Board -- rephrase that.

22        Was there any other research done by anyone

23   other than you on behalf of Defendants about GSAs?

24   A    Not to my knowledge.

25   Q    In your research about GSAs, did you come

```
 1    sexual experimentation?

 2        A    Specific research I cannot name.

 3        Q    Are you aware of any research on that

 4    specific topic?

 5        A    I would have to look back.

 6        Q    How does the Okeechobee GSA promote

 7    premarital sexual activity?

 8        A    The Okeechobee GSA as it exists as far as I

 9    know does not.

10        Q    How does any GSA promote premarital sexual

11    activity?

12        A    Again, our opinion is the mere topic and

13    discussion of sexual activity and sexual orientation

14    can lead to premature sexual activity.

15        Q    Does the Okeechobee GSA as proposed lead to

16    premarital sexual activity?

17             MR. GIBBS:   I'm going to object as to asked

18        and answered a lot of different ways.

19             She can answer the question again.

20             THE WITNESS:   The purpose, as I stated,

21        focuses on sexual orientation, gender identity.

22        These discussions are for parent/student,

23        parent/child discussion.

24             To link specifically a GSA discussion to sex,

25        I cannot give you a specific but the discussion of
```

1        these topics, we believe, lead to premature sexual

2        experimentation and the negative effects of that.

3   BY MR. ROSENWALD:

4        Q    Anything else?

5        A    No.

6        Q    Can the Defendant name anything at all that

7   the Okeechobee GSA --

8             MR. CHOE:  Did you answer out loud to that

9        last question?

10            THE WITNESS:  Yes.

11  BY MR. ROSENWALD:

12       Q    Your answer was?

13       A    You asked me if there was anything else and I

14  said no.

15       Q    Can Defendant name anything at all that the

16  Okeechobee GSA has done to promote premarital sexual

17  activity?

18       A    The Okeechobee GSA as it exists?  No.

19       Q    Does the presence of a GSA -- does the

20  presence of a GSA interfere with communication with

21  parents about sexual issues?

22       A    Potentially.

23       Q    How so?

24       A    Students need to have these discussions with

25  parents.  They don't need to be talking among

1    themselves and listening to possibly erroneous

2    information from each other.

3              So, having a forum such as that might keep a

4    student from going home and talking to the parent.

5        Q    Anything else?

6        A    No.

7        Q    Has the Okeechobee GSA interfered with

8    communication with any parent about sexual issues?

9        A    The Okeechobee GSA as it exists?  Not to my

10   knowledge.

11       Q    How about as it was proposed?

12       A    Potentially.

13       MR. GIBBS:  Can I object again?  Every

14       question gets to, you ask it, you re-ask it.  I

15       mean, she's giving the discussion in her mind

16       leads to action -- I mean -- and you can ask it

17       three or four times but, I mean, it's getting to

18       be the same answer over and over again.

19       MR. CHOE:  The question on the table is

20       distinct.

21       MR. GIBBS:  Not from the previous one.

22       MR. CHOE:  Yes, it was.

23   BY MR. ROSENWALD:

24       Q    In general, do you think that the Okeechobee

25   GSA as it is currently structured is different than the

1    way it was proposed?

2        A    Yes.

3        Q    What is different?

4        A    The issues to be discussed are limited.

5        Q    To what?

6        A    To harassment and discrimination in general.

7        Q    So at this time the Okeechobee GSA is being

8    limited by the School Board of Okeechobee County to

9    discussing harassment and discrimination in general?

10       A    The limitation was due to the temporary

11   injunction.

12       Q    At this time is the School Board of

13   Okeechobee County limiting the discussions of the

14   Okeechobee GSA to only discussions of harassment and

15   discrimination in general?

16       A    We are following the temporary injunction.

17       Q    At this time are students of the Okeechobee

18   GSA being prohibited by the School Board of Okeechobee

19   County from discussing any issue other than harassment

20   and discrimination in general?

21           MR. GIBBS:   Object.  You can read the

22       question she just gave that was an identical

23       question.  She says they're following the

24       preliminary injunction.

25           If you don't like the answer the first time,

1      it's not going to change the second time.

2           MR. ROSENWALD:  She can answer the question.

3      If she wants to answer a different question, we

4      can sit here all day.

5           MR. GIBBS:  The questions are identical.  You

6      repeated yourself for no reason.  She said they

7      are following the injunction.

8           MR. ROSENWALD:  Are you through?

9  BY MR. ROSENWALD:

10      Q    Are students permitted to have discussions

11  other than harassment and discrimination at the

12  Okeechobee GSA in general today?

13      A    The students are allowed to discuss those

14  items that were limiting in the injunction.

15      Q    What would the proposed Gay-Straight Alliance

16  have discussed other than harassment?

17           How are they different?

18      A    According to the proposal?

19      Q    Yes.

20      A    (The witness reviewed the document).

21           MR. CHOE:  So the record could reflect that

22      the deponent is looking at Exhibit 4.

23           MR. ROSENWALD:  Thank you.

24      A    (The witness reviewed the document.)  The

25  sexual orientation and gender identity of students is

1    mentioned in the purpose as a topic of discussion.

2        Q    So today is the Okeechobee Gay-Straight

3    Alliance prohibited by the School Board from discussing

4    issues relating to sexual orientation and gender

5    identity?

6        A    The discussions of the Okeechobee GSA are

7    limited to those outlined in the temporary injunction.

8        Q    I want to explore your understanding of what

9    the temporary injunction allows.

10            Are students allowed to discuss issues

11   relating to harassment of gay students at this time at

12   Okeechobee High School?

13       A    They are allowed to discuss issues of

14   harassment and discrimination of any nature.

15       Q    Are they allowed to discuss harassment and

16   discrimination against gay people in particular?

17            MR. GIBBS:  Object.  This is a hypothetical.

18       The Club doesn't meet most weeks but --

19            THE WITNESS:  I would say again, the

20       discussions are limited to those issues in the

21       temporary injunction.

22   BY MR. ROSENWALD:

23       Q    Have you ever read the temporary injunction?

24       A    Yes.

25       Q    Is there -- in your opinion, does the

1  preliminary injunction state that students may not

2  discuss harassment and discrimination against gay

3  people?

4      A    My opinion, the temporary injunction limits

5  discussions to discrimination and harassment of

6  students.

7      Q    In general?

8      A    In general.

9      Q    Is the Okeechobee GSA today allowed to have

10  discussions promoting tolerance, equality among

11  students of all sexual orientation and gender identity

12  through educational efforts and awareness building?

13      A    The topics of tolerance, inequality, the

14  topics of harassment and discrimination are all

15  discussed.

16      Q    Are they allowed to discuss them with

17  particularity as they relate to gay people?

18      A    There is no exclusivity to the topic of

19  harassment, the topic of discrimination.

20      Q    That is allowed?

21      A    No.  I'm saying it's not limited.

22      Q    Is the Okeechobee GSA today permitted by the

23  School Board to inform members and the student body of

24  issues and efforts affecting the lives of lesbian, gay,

25  bisexual, transgender and straight allied youth?

1   A    The Okeechobee GSA is limited by the

2   temporary injunction to the activities and the topics

3   that are specific to that injunction.

4   Q    Is it your understanding that the preliminary

5   injunction that the Court entered allows the School

6   Board to prohibit the GSA to inform members and the

7   student body of issues affecting the lives of gay,

8   lesbian, transgender and allied youth?

9   A    It's my opinion that the injunction limits

10  discussion to harassment and discrimination.

11  Q    When you say your "opinion," you mean on

12  behalf of the School Board?

13  A    Uh-huh.

14  Q    Are you saying "yes" or "no"?

15  MR. GIBBS:  Object as to form.

16  THE WITNESS:  The topics are those contained

17  within the temporary injunction.

18  BY MR. ROSENWALD:

19  Q    Is that a "no"?

20  A    Do we have a copy of the temporary injunction

21  I could look at?

22  MR. CHOE:  We have one in the car.

23  MR. GIBBS:  Let me say this.  Number one,

24  your client would be the in the best position to

25  know what is happening in the Club.  The Club

ATLANTIC REPORTING
Stuart, Port St. Lucie, Fort Pierce,
Vero Beach and Okeechobee, Florida

1    Q    Dr. Cooper, you've had a chance to review the

2    preliminary injunction that was marked in this case.

3    I'll mark it as Cooper 6.

4         Have you had the opportunity to review this

5    order?  You've had the opportunity talk to Mr. Gibbs

6    about it.

7         In your understanding, where does this

8    preliminary injunction say that the School can limit

9    the GSA discussions to topics relating to harassment

10   and discrimination in general?

11   A    On Page 7, the first paragraph, the

12   discussion -- the way I read this -- should involve

13   tolerance and no obscene or explicit sexual material

14   should be permitted.

15   Q    Can we start by reading the exact language of

16   what you're talking about?

17   A    "While this Court agrees that sharing obscene

18   or explicit sexual material with children under the age

19   of 18 would be contrary to the well-being of students,

20   this Court has been given no reason to believe that the

21   OHS GSA will not dedicate itself to the purposes such

22   as tolerance that is outlined without involving obscene

23   or explicit sexual material."

24   Q    In your opinion, that passage that you just

25   read indicates that the School Board may restrict the

1    Okeechobee GSA to discussing discrimination and

2    tolerance in general as opposed to gay people

3    specifically?

4             MR. GIBBS:  Object as to form.  You can

5         answer.

6             THE WITNESS:  That would be correct.

7    BY MR. ROSENWALD:

8         Q    Anything else?

9         A    No.

10        Q    Would you turn to -- just to clarify, there's

11   nothing other than that passage that supports the

12   conclusion that you've come to limiting discussions of

13   the GSA to tolerance in general?

14            MR. GIBBS:  (Pointing.)

15            MR. CHOE:  If the record could reflect that

16        counsel is pointing out a specific passage to the

17        deponent.

18        A    The bottom of Page 6, next to the last line.

19        Q    Could you read that?

20        A    "Plaintiffs further assert that the OHS GSA

21   does not discuss sex, let alone promote sexual

22   activity."

23            MR. GIBBS:  (Pointing.)

24        Q    Mr. Gibbs is pointing passages to you.  Would

25   you care to read what he is pointing to you?

1    A    On the top of Page 11, first paragraph,

2    second line, "Plaintiff's assertion that the Club is

3    not based around sex and that the OHS GSA does not

4    discuss sex let alone promote sexual activity."

5    Q    Anything else?

6    A    No.

7    Q    Could you turn to Page 11 starting with the

8    fourth line from the bottom in the conclusion section

9    of this order, could you read that paragraph?

10   A    "Ordered and adjudged that the Defendant

11   shall so long as it maintains a limited open forum

12   under the GSA grant official recognition and grant all

13   privileges given to other clubs at the School to the

14   Okeechobee High School Gay-Straight Alliance Club."

15   Q    Does that order say anything about limiting

16   the Club's discussion to harassment or tolerance in

17   general?

18   A    I believe it does.

19        MR. GIBBS:  Let me just -- so the record is

20        reflecting, counsel is looking at Page 11 and

21        ahead of the "ordered and adjudged" it says "for

22        the reasons set forth above."

23        I think the whole order needs to be read in

24        context.  Obviously Judge Moore issued his order,

25        he knows what he intended and the School has

ATLANTIC REPORTING
Stuart, Port St. Lucie, Fort Pierce,
Vero Beach and Okeechobee, Florida

1    interpreted it.  I believe we have on the record

2    clearly that the intention has been to comply

3    fully with the entire order of the Court.

4  BY MR. ROSENWALD:

5    Q    Today under this preliminary injunction, is

6  the Okeechobee GSA permitted to have an event and

7  activity creating a safe, welcoming place for LGBT and

8  straight allied students to socialize and talk together

9  about issues they hold in common?

10         Yes or no?

11    A    They're allowed to meet, they're allowed to

12  discuss topics limited by the temporary injunction.

13    Q    That is not what I asked you.

14    A    Okay.

15    Q    I asked you, are students of the Okeechobee

16  GSA allowed to meet today to create a safe and

17  welcoming space for LGBT and straight and allied

18  students to socialize and talk together about issues

19  they hold in common?

20         MR. GIBBS:  I'm going to object.  She just

21    said -- again, you don't have to like the answer,

22    you don't have to think.

23         MR. ROSENWALD:  I'm entitled to a responsive

24    answer, David.

25         MR. GIBBS:  Let's have her read back what she

1    said last time.

2                    (The last answer was read by the

3                    reporter.)

4           MR. ROSENWALD:  Let me rephrase the question.

5           MR. GIBBS:  We're not going to be here all

6    day because we've got a person coming at 2:30.

7    BY MR. ROSENWALD:

8      Q    In the School Board's opinion, does Judge

9    Moore's preliminary injunction allow the School to

10   prohibit activities of the GSA to create a safe and

11   welcoming place for LGBT students to socialize and talk

12   together about issues they hold in common?

13           Yes or no?

14     A    They are allowed to meet and discuss the

15   issues of tolerance, the issues of discrimination and

16   harassment not limited to gay, straight topics.  It's a

17   general --

18     Q    And nothing else?

19     A    -- discussion.

20     Q    Sorry to interrupt you.  And nothing else?

21     A    The way I read this.

22     Q    You're referring to the preliminary

23   injunction?

24     A    Yes.  They are limited to what they may and

25   may not discuss.  Excluded are any discussions of

ATLANTIC REPORTING
Stuart, Port St. Lucie, Fort Pierce,
Vero Beach and Okeechobee, Florida

1   sexual activity at all.

2       Q    That is not my question.  I think you know

3   that, Dr. Cooper.

4           MR. GIBBS:  I'm not going to -- number one,

5       Dr. Cooper has answered your question over and

6       over and over again and we're in a completely

7       hypothetical realm because, I mean, the Club is

8       basically defunct.  At the end of the day,

9       she's --

10          MR. ROSENWALD:  David --

11          MR. GIBBS:  I'm not going sit here and let

12      you harass her.  You're asking the same question

13      over and over again.

14          MR. ROSENWALD:  If she wants to not answer

15      the question, I can ask it again.  She keeps

16      answering a different question.

17          MR. GIBBS:  The questions are identical.

18      They complied with the order.  They are allowed to

19      meet.  They are allowed to discuss the subjects.

20      They are limited from what they interpret Judge

21      Moore's order -- by the way, that is based on your

22      own representation to the Court to get the

23      injunction.

24          MR. CHOE:  Hold on, David.

25  BY MR. ROSENWALD:

1     Q   If the students of the Okeechobee GSA were to

2 limit their discussions to harassment and

3 discrimination but based -- specifically based on

4 sexual orientation but nothing outside of that, is it

5 Defendant's opinion that would violate the preliminary

6 injunction?

7     A   Yes.

8         MR. CHOE:  That's all we wanted to know.

9         MR. CONELY:  Why wasn't it asked that way?

10 BY MR. ROSENWALD:

11     Q   Does the SBOC contend that the Court's

12 preliminary injunction allows them to prohibit

13 discussions at the Okeechobee GSA based on

14 discrimination and harassment against gay people in

15 particular?

16         MR. GIBBS:  Object as to form.

17         THE WITNESS:  I'm sorry.  I didn't hear what

18     you said.

19         MR. GIBBS:  Sorry.  I objected as to form.

20     It's also asking for her to make legal conclusion

21     but --

22         MR. ROSENWALD:  I've asked her if she would

23     allow it.  She says she won't answer the question,

24     so I have to ask it another way.

25         Could you read back the question?

```
 1              (The last question was read by the

 2              reporter.)

 3         THE WITNESS:  The temporary injunction limits

 4    the scope of the discussions to tolerance and

 5    harassment and discrimination, not of any

 6    particular group.

 7    BY MR. ROSENWALD:

 8         Q    So your answer is "yes"?

 9         MR. GIBBS:  Objection.  That wasn't her

10    answer.  She gave her answer.

11         MR. ROSENWALD:  Why is it so hard to answer

12    yes or no to this question whether the discussion

13    would be discouraged or not?

14         MR. GIBBS:  I can answer that -- okay --

15    because, number one, it's hypothetical.  Number

16    two --

17         MR. ROSENWALD:  David, I am not assuredly

18    asking you to answer the question for your

19    witness.

20         MR. GIBBS:  As legal counsel, I can speak as

21    I deem appropriate.

22              Number three --

23         MR. ROSENWALD:  No, you can't.  You can't

24    make speaking objections and interject into my

25    deposition.
```

```
 1        A     Yes.

 2        Q     Is there anything else?

 3        A     Not to my knowledge.

 4        Q     Has any student suffered negative

 5   repercussions as a result of his or her participation

 6   in the Okeechobee GSA?

 7        A     Not that I'm aware of.

 8        Q     Do high schools and their curriculum serve

 9   other purposes than preparing students for careers?

10        A     Yes.

11        Q     What is the purpose of extra-curricular

12   activities?

13        A     They're multi-purposes.  One is to enhance

14   the educational experiences of the students.  One is to

15   provide activities that might lead to student

16   scholarships and then there are social activities.

17        Q     Are these all beneficial purposes?

18        A     Yes.

19        Q     Does participants in the extra-curricular

20   activities in general help prepare students for

21   careers?

22        A     Yes.

23        Q     How?

24        A     I could use an example.

25        Q     Okay.  Go ahead.
```

112

```
 1        A     The FFA includes a lot of activities
 2   regarding leadership opportunities, public speaking,
 3   competition and contemporaneous speaking.  Those are
 4   absolutely preparation for a career in future
 5   endeavors.
 6        Q     Does advocating for an end to bullying for
 7   gay and straight students help to prepare students for
 8   careers?
 9        A     We advocate to putting an end to bullying and
10   harassment to all students.
11        Q     I understand that.  My question is, does
12   advocating for an end to bullying and harassment of gay
13   students help prepare students for careers?
14        A     I would say it would help prepare students
15   for not specifically careers but for future life.
16        Q     How so?
17        A     Just getting along with people, social
18   skills, not to bully, not to harass.
19        Q     Anything else?
20        A     (Shakes head.)
21        Q     Is it the position of the Okeechobee School
22   Board that it can prohibit student discussions on
23   School grounds of homosexuality and the homosexual
24   lifestyle and relationship?
25             MR. GIBBS:  Object as to form.  You can go
```

1      orientation and sexual activity.  That should not

2      be a part of the bylaws and constitution of any

3      club.

4  BY MR. ROSENWALD:

5      Q    Would the Okeechobee School Board allow the

6  Fellowship of Christian Athletes to have a discussion

7  at one of their meetings about the Bible's position on

8  homosexuality?

9          MR. GIBBS:  Objection.

10         THE WITNESS:  No.

11         MR. GIBBS:  Just so we're making this very

12     clear for the record, these are hypothetical

13     because I think she's already testified there is

14     no Fellowship of Christian Athletes at the School.

15     So, we're dealing with a hypothetical club and a

16     hypothetical scenario.

17  BY MR. ROSENWALD:

18     Q    Does banning the Okeechobee GSA from School

19  grounds help prevent heterosexual activity?

20     A    No.

21     Q    Does banning the Okeechobee GSA from School

22  grounds help prevent teen pregnancy?

23     A    Not the banning of it, no.

24     Q    Do the negative health effects of homosexual

25  sex justify prohibiting the Okeechobee GSA?

1       A       The prohibiting of the GSA was based on the

2   School Board's policy and Florida Statute.

3       Q       Are the negative health effects of homosexual

4   sex one of the factors -- let me back up.

5               Are the negative health effects of homosexual

6   sex one of the factors that the School Board relies on

7   in order to prohibit the GSA from Okeechobee High

8   School?

9       A       The prohibition was not based on homosexual

10  activity.  The prohibition was based on the fact that

11  we are an abstinence only district.  Sexual activity,

12  sexual orientation is not something we discuss openly

13  with students.  That's a role of the parent.  So, I

14  would say it was not the basis, no.

15      Q       Tell me about Okeechobee's zero tolerance for

16  harassment policy.

17      A       That is the part of our Code of Student

18  Conduct and it's very clear in terms of violations and

19  consequences.

20      Q       Is discrimination against gay students a

21  problem at Okeechobee High School?

22      A       What do you mean by "a problem"?  I mean,

23  it's a problem -- if it happens one time, it's a

24  problem.

25      Q       Does the School Board consider it to be a

1   problem at Okeechobee High School?

2       A    It is not a major problem in terms of many

3   instances not to my knowledge.

4       Q    Is discrimination against gay students a

5   problem in society generally?

6       A    I don't know.

7       Q    Do gay students suffer bulling and harassment

8   higher than the general population of students?

9       A    I don't know.

10      Q    Has the Okeechobee County School Board taken

11  any steps to alleviate anti-gay discrimination and

12  harassment in particular?

13      A    The steps Okeechobee has taken deal with

14  harassment and discrimination of all kinds.

15      Q    Anything specific to gay students?

16      A    Not specifically.

17      Q    What steps does the School Board of

18  Okeechobee County take to prevent sex abuse of

19  students?

20      A    We have in our Code of Student Conduct the

21  policy against abuse -- sexual and otherwise -- that is

22  enforced.

23      Q    Anything else?

24      A    No.

25      Q    Does denying access to the Okeechobee GSA

1    serve to protect students from child sex abuse or

2    molestation by either sexual -- by either students or

3    adult predators?

4         A    Would you repeat that, please?

5         Q    Sure.  Does denying access to the Okeechobee

6    GSA serve to protect students from child sex abuse or

7    molestation by either students or adult predators?

8         A    In my opinion, again, when students are

9    discussing sex and sexual activity, sexual orientation

10   and there are any kinds of discussions of sites

11   available to them that might lead to abuse or

12   molestation, then that is a problem.

13        Q    Has the Okeechobee GSA exposed any student to

14   child sexual abuse or molestation?

15        A    Not to my knowledge.

16        Q    Has any non-student ever attended an

17   Okeechobee GSA meeting?

18        A    Has any non-student attended?

19             MR. GIBBS:  If you know.

20        A    Prior to the formation at the high school, I

21   don't know.

22        Q    What about after the entry of the Club on to

23   the School campus?

24        A    Other than the sponsor, not to my knowledge.

25        Q    Are non-students allowed to attend Okeechobee

119

1  High School clubs?

2      A    If there's an invitation to speak, that would

3  be an allowance, yes.

4      Q    Any other situation?

5      A    Not to my knowledge.

6      Q    Is any member of the Okeechobee GSA a student

7  sexual predator?

8      A    I don't know.

9      Q    Does SBOC contend that any GSA member has

10 engaged in any unlawful sexual conduct with anyone?

11     A    No.

12     Q    Does Defendant contend that any GSA member

13 has attempted to engage in unlawful sexual conduct with

14 anyone?

15     A    No.

16     Q    Are gay people more likely to sexually abuse

17 children than heterosexuals?

18     A    I have no idea.

19     Q    Are you aware of any empirical, scientific

20 evidence suggesting that gay people sexually abuse

21 children more than heterosexuals?

22     A    No.

23     Q    Are you aware of any scientific evidence

24 finding that gay people do not sexually abuse children

25 at a higher rate than heterosexuals?

1      A      No.

2      Q      Are gay students more likely to perpetrate

3 child sex abuse for molestation than other students?

4      A      I have no idea.

5      Q      Are student perpetrators of child sex abuse

6 more likely to be GSA members than participants of

7 other groups?

8      A      I don't know.

9      Q      Do you have any basis to think that they

10 would be?

11     A      No.

12     Q      Are adult sexual predators more likely to

13 target GSA participants than participants of other

14 student groups?

15     A      I don't know.

16     Q      Do you have any reason to think so?

17     A      No.

18     Q      Is it the position of the Okeechobee School

19 Board that homosexuality and the homosexual

20 lifestyle/relationships are appropriate topics

21 beginning at college age?

22     A      At "adult" age.

23     Q      Why?

24     A      Again, teenagers, pre-teens are in our

25 opinion experimenting too young.  If an adult chooses

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 06-14320-Civ-Moore/Lynch

GAY-STRAIGHT ALLIANCE OF
OKEECHOBEE HIGH SCHOOL, et al.,

    Plaintiffs,

vs.

SCHOOL BOARD OF OKEECHOBEE
COUNTY,
    Defendant.

CERTIFIED COPY

_____ /

DEPOSITION OF:  DR. PATRICIA COOPER
VOLUME II

| | |
|---|---|
| DATE: | February 8, 2008 |
| TIME: | 8:00 a.m. to 12:00 p.m. |
| PLACE: | 410 NW 6th Street |
| | Okeechobee, Florida |
| | |
| TAKEN BY: | Amy J. Schreck, Registered Professional |
| | Reporter and Notary Public, State of Florida |
| | at Large |

APPEARANCES:
FOR PLAINTIFFS:    Robert Rosenwald, Jr., Esquire
           American Civil Liberties Union
           4500 Biscayne Boulevard, Suite 340
           Miami, Florida 33137
           (786)363-2713

           Ken Choe, Esquire
           American Civil Liberties Union
           125 Broad Street, 18th Floor
           New York, New York 10004
           (212)549-2553

```
 1        saying this one is new or are they both --
 2             MR. ROSENWALD:  They both have been served.
 3        The first one is not the original one that was
 4        served before the last --
 5             MRS. WELLER:  Go off the record for a second.
 6                       (There were remarks off the record
 7                        and the witness reviewed the
 8                        documents.)
 9   BY MR. ROSENWALD:
10        Q    You've had a chance to review Cooper 7 and
11   Cooper 8?
12        A    Yes, I have.
13        Q    Are you authorized and prepared to testify on
14   behalf of the School Board of Okeechobee County on all
15   of the subjects listed?
16        A    Yes, I am.
17        Q    Thank you.  I want to make sure that you
18   understand that when I refer to "you," I mean to
19   include not only you personally but also anyone else on
20   behalf of Defendant School Board of Okeechobee County
21   unless I expressly say otherwise.
22        A    I understand.
23        Q    If I refer to "Defendant," I mean the School
24   Board, the School District, the High School and any
25   agents thereof.
```

1    voracity of something that somebody said, but if

2    there's anything that you know is false, just let me

3    know.

4        A    I can verify my quotes and in terms of my

5    quotes and some statements that are not in quotation

6    marks, I would say that the reporter captured the

7    essence of her interview with me.

8        Q    Is there anything that you said for this

9    interview for this article that you to date disagree

10   with?

11       A    (The witness reviewed the document.)  In

12   terms of my quotes, no, there's nothing.

13       Q    Is the Okeechobee School newspaper published

14   by the School Board of Okeechobee County?

15       A    No, it is not.

16       Q    Is there a class that publishes the School

17   newspaper at Okeechobee High School?

18       A    The journalism class at Okeechobee High

19   School is responsible for the paper.

20       Q    We have previously discussed a set of bylaws

21   for the Gay-Straight Alliance that we have been

22   referencing as the bylaws of the Gay-Straight Alliance

23   and has been previously entered as an exhibit.

24            MR. CHOE:  Let's go off the record a moment.

25                      (There were remarks off the

1        Q      Something we haven't talked about yet.

2        A      Okay.  Comparing the three exhibits, I would

3    restate my position in terms of objection.  Our focus

4    at the High School is academics, it's for career

5    preparation, for educational preparation.  We don't

6    want to focus any group -- any club's formation on

7    anything relating to sexual orientation, sexual

8    behavior or sexual activity.

9           So I would say that the position that I

10   previously stated would stand for all three of these.

11       Q      Is there anything new?  They're all pretty

12   similar.  Correct?

13       A      Yes.  I haven't had a chance to study the

14   constitution as it is with all of the different

15   articles but in terms of purpose, if that's the focus

16   here -- I see that they're very similar, not verbatim,

17   and my position would remain that we would not allow

18   this club based on several of the purposes that I

19   previously mentioned.

20       Q      Just to clarify, none that you have not

21   mentioned -- no reason that you have not mentioned thus

22   far?

23       A      Not that I see currently.  Okay.

24       Q      Would the School Board of Okeechobee County

25   allow any student organization to meet on OHS School

1  grounds with the constitution that has been marked as

2  Cooper 11?

3      A    (The witness reviewed the document.)   The

4  Gay-Straight Alliance that is currently operational at

5  Okeechobee High School has limited purpose.   The

6  purposes reflected here are not the purposes that are

7  allowed to be discussed at the existing Okeechobee High

8  School GSA.

9      Q    Let me rephrase my question.   Absent a Court

10  order requiring you to do so, would the School Board of

11  Okeechobee County allow any new student organization to

12  meet on Okeechobee High School grounds with the

13  constitution that is attached to the complaint and as

14  marked as Cooper 11 to this deposition?

15      A    I would repeat, our objection is to the

16  purposes stated here.   We would not allow a club to

17  form and to meet for discussion of sexual orientation,

18  sexual behaviors, sexual activities.   We would not.

19      Q    Would the School Board of Okeechobee County

20  allow any student organization to meet on Okeechobee

21  High School grounds with the bylaws that have been

22  marked as Cooper 10 to this deposition absent a Court

23  order requiring it to do so?

24      A    (The witness reviewed the document.)   To

25  repeat myself, I would say based on this constitution,