1   the purposes set forth that are for the purposes of

2   discussing sexual orientation, sexual behaviors, sexual

3   information, we would not.

4        MR. CHOE:  Note for the record that the

5      deponent is referring to Cooper 10; is that

6      correct?

7        THE WITNESS:  I believe that is what he

8      referenced was Cooper 10.

9        MR. CHOE:  You are referring to Cooper 10?

10       THE WITNESS:  Correct.

11  BY MR. ROSENWALD:

12     Q    Was one reason that Defendant denied access

13  to the Okeechobee GSA that participation in the group

14  may make students turn from straight to gay.

15       MR. GIBBS:  Object as to form.  Go ahead and

16      answer.

17       THE WITNESS:  One reason we objected?

18  BY MR. ROSENWALD:

19     Q    Yes.

20     A    Our reason was based on the fact that any

21  club forming around the purposes of discussing sexual

22  orientation, sexual activity and sexual behavior would

23  not be allowed.

24     Q    Superintendent, I'm going to be asking you a

25  lot of questions.  I'm not trying to trick you.  I'm

```
 1   is trying to avoid by denying access to the GSA?
 2        A    The harm is in having students given a forum
 3   to discuss anything of a sexual nature.
 4        Q    Anything else?
 5        A    No.
 6             MR. ROSENWALD:  Could we take a break?
 7             MR. GIBBS:  The only issue I might raise is I
 8        can probably do that call as early as nine if we
 9        take a break now.  It's up to you.
10                    (There was a short break.)
11             MR. GIBBS:  We have reviewed some photocopies
12        that were provided to opposing counsel of student
13        newspapers and the legal scholarship directly
14        labeled 2006/2007 and as we have provided them to
15        them in the discovery process, we are not in any
16        way challenging the authenticity of what we have
17        provided to them through discovery and would view
18        them as authentic for what ever purposes
19        Plaintiff's counsel wishes to use them.
20             MR. ROSENWALD:   Thank you.
21   BY MR. ROSENWALD:
22        Q    Do student clubs have web pages?
23        A    I'd have to know which specific clubs you're
24   talking about.
25        Q    Do any student clubs at Okeechobee High
```

1    "news in the middle?

2         A    "The Spring Drill meet will take place on

3    Saturday, February 24th, 2007.  Parents are welcome to

4    attend this competition.  It be held at Port St. Lucie

5    High School, 1201 SE Jaguar Lane, Port St. Lucie,

6    Florida 34952 (772)337-6770.  If any questions are to

7    come up, please do not hesitate to speak with Colonel

8    Saucier, Sergeant Mitchell" or I guess that's "LTC

9    Solis."

10        Q    Does the JROTC organization attend events

11   sponsored by other schools?

12        A    They are a curriculum, they are a program --

13   a JROTC program that has competitions among other

14   schools.

15        Q    So "yes"?

16        A    Yes.

17        Q    Do non-curricular clubs at Okeechobee High

18   School attend events at other schools?

19        A    I would have to know which one specifically

20   you're referring to.

21        Q    Do you know which one you're referring to?

22        A    Please define for me "non-curricular."  I

23   think my definition might be different from your

24   definition.

25        Q    Does any club attend events at other high

1    schools?

2        A      Specific clubs do, yes.

3        Q      If you turn to the home page of the

4    unofficial web site, the way you can tell it's "Home"

5    is because in bold on the side.

6               Is the emblem in the middle of this page the

7    logo for Okeechobee High School?

8        A      The official logo for Okeechobee High School

9    is on Page 1 of 1.

10       Q      Is there only one official logo?

11       A      There's one official logo, yes.

12       Q      Does the School use other logos besides the

13   official logo?

14       A      Not to my knowledge.

15       Q      Do you know if there is clip art of various

16   logos provided on the Okeechobee High School web site?

17       A      I don't know that.

18       Q      Have you ever given permission to JROTC to

19   use the logo of Okeechobee High School on its web site?

20            MR. GIBBS:  I'm going to object.  Are we

21       saying that that logo is on there or it isn't?

22            MR. ROSENWALD:  I'm not saying it is or it

23       isn't.  I'm asking if they asked or ever received

24       permission to use the logo of Okeechobee High

25       School on the web site.

155

1          MR. GIBBS:  The question is not is if there

2     is.  The question is have they requested

3     permission.

4          Go ahead.

5          THE WITNESS:  They have not requested

6     permission from me.  No, they have not.

7  BY MR. ROSENWALD:

8     Q     Have you ever given them permission?

9     A     I have not.

10    Q     If you could turn to the page marked "Links"

11 that has the page with "Links" in bold on the left-hand

12 side of the page, describe this page to me.

13    A     It says "LINKS. http://www.psljrotc.com,

14 http://www.okee.k12.fl.us./ohs --

15    Q  .  Let me interrupt you.  For the sake of time,

16 I don't need you to read the address, but does it

17 appear to be links to other web sites?

18    A     There are other web sites listed as links.

19    Q     Are some of them Okeechobee High School web

20 page links?

21    A     The "okee.k12.fl.us."

22    Q     Are some of the web pages not affiliated with

23 the School Board of Okeechobee County?

24    A     The Brevard and the PSL JROTC do not appear

25 to be.

```
 1
 2              He jerked his cord, the silk spilled out
                and wrapped around his legs.
 3              He ain't gonna jump no more.
 4              Gory, Gory, What a helluva way to die
                Gory, Gory, What a helluva way to die
 5              Gory, Gory, What a helluva way to die
                He ain't gonna jump no more.
 6
 7      Q       I will allow you to read silently the rest of
 8   it.
 9      A       (The witness reviewed the document.)
10           MR. ROSENWALD:  I'd just like to read the
11   last part of it out loud.  There is I'll note for
12   the record some parts in between I'm not reading
13   but the last part.
14              He hit the ground, the sound was splat,
                his blood went spurting high;
15              His comrades were then heard to day,
                "A helluve way to die"; (sic)
16              He lay there rolling 'round in the welter
                or his gore.
17              He ain't gonna jump no more.
18              Gory, Gory, What a helluva way to die
                Gory, Gory, What a helluva way to die
19              Gory, Gory, What a helluva way to die
                He ain't gonna jump no more.
20
                There was blood upon the risers, there
21              were brains upon the chute;
                Intestines were a-dangling from this
22              paratrooper's boots;
                They picked him up, still in his chute
23              and poured him from his boots.
                He ain't gonna jump no more.
24
25              Is there anything appropriate in your mind
```

160

1  about the material on the Cadence page of the JROTC web

2  site?

3          MR. GIBBS:  Object as to the form but you may

4      comment as you wish.

5          THE WITNESS:  Well, this is a program that

6      prepares students for military experience.  In

7      this program they speak cadences.  I don't know if

8      these are ones that are used in the program but I

9      know that they do speak cadences and it would

10     appear that these cadences are some that are

11     available to them to use.

12  BY MR. ROSENWALD:

13     Q    That is true.  Is there anything

14  inappropriate about the cadences listed on the web site

15  for high school students?

16          MR. GIBBS:  Same objection.  She can comment

17     again.

18          THE WITNESS:  As students are prepared for

19     the military and they also are aware that death is

20     a part or could be a part of the military, this is

21     rather extreme -- I would say -- in some of the

22     language but the essence of it is that there is

23     death as a part of the military.

24  BY MR. ROSENWALD:

25     Q    So the answer is no, there's nothing

```
 1   unappropriate about it?
 2         MR. GIBBS:  Object; it's mischaracterizing
 3      what she said.  She's saying in the context of the
 4      military JROTC program.
 5   BY MR. ROSENWALD:
 6      Q    Are the cadences that we've read listed here
 7   on the unofficial web site of the JROTC group a basis
 8   to deny access to the JROTC group from Okeechobee High
 9   School?
10      A    No.
11      Q    Could we turn to the last page now and can
12   you tell me what based on the bold the word on the left
13   what page this appears to be?
14      A    The bolded words are "Color Guard."
15      Q    Although you can't see all of the pictures
16   because there appears to be a pop-up add in front of
17   the picture, can you see what the picture is labeled?
18         MR. GIBBS:  I want to object.  The only
19      reason why I'm objecting, I'm looking and it
20      appears that there are -- and, again, it's in the
21      thing and I think we need to make this clear for
22      the deponent there were four internet Explorer
23      sites open simultaneously on this computer and we
24      don't know that this pop-up appeared for which
25      site, number one.
```

1      using.  His computer may have the pop-up blocker.

2      The computer's security system controls whether or

3      not a pop-up comes up.  The web site itself -- I'm

4      trying to look in the background.  It looks like

5      student pictures of the Color Guard is not

6      objectionable.

7           If I may, I do not control individual

8      computers except for those that are Okeechobee

9      County school system computers.

10  BY MR. ROSENWALD:

11      Q    If this pop-up advertisement came up on a

12  student's home computer who admittedly SBOC does not

13  control, would that be a basis to deny access to the

14  JROTC organization?

15      A    No, because the web page, the web site itself

16  that is produced does not control the pop-ups.

17      Q    Is this web site overall the unofficial web

18  site for Okeechobee JROTC?  You've seen various pages

19  of it here today.

20           Over all, is there anything objectionable

21  about it to SBOC?

22      A    I have a concern that what is on the page

23  that says "Brahman Battalion" has a logo that is not

24  the official logo of Okeechobee High School.

25      Q    Is that a reason to deny access to the JROTC

1   organization?

2      A   I would have to find out if Okeechobee High

3   School gave permission for JROTC to use a rendition of

4   the logo.

5      Q   Any other reason that this web site might be

6   a reason to deny access to the JROTC organization?

7      A   Not as I see it.

8      Q   Does Okeechobee High School library contain

9   books discussing sexual orientation?

10     A   Not to my knowledge.

11     Q   Would it be a problem if it did?

12     A   Our policy, our focus is abstinence only and

13  the focus is is on abstinence only.  In terms of what

14  is in the media center, we have a process if something

15  is objectionable and that objection is raised by

16  someone, there's a process to review that material and

17  the potential is there to remove it.

18     Q   If somebody raised an objection based on the

19  fact that a book in the School library discussed sexual

20  orientation, would the book be removed?

21     A   The removal of the book would go to a

22  committee -- the question of the book would go to a

23  committee.  There is an absolute review process that we

24  use that reviews the book in its entirety and then the

25  decision is made as to whether or not to remove it from

1    the library.

2        Q    So books discussing sexual orientation might

3    be acceptable depending on their content?

4        A    Well, it would depend on the book itself, it

5    would depend on the content, the context and the

6    outcome of the review process.

7        Q    Would it depend on anything else?

8        A    Not that I can think of.

9        Q    Does the Okeechobee High School library

10   contain books with gay characters?

11       A    I have no idea.

12       Q    Would it be a problem if it did?

13       A    Again, if the book were -- if there was a

14   question about the book, the process would be initiated

15   and the determination would be made by a committee as

16   to whether or not that particular book was

17   objectionable.

18       Q    Anything else?

19       A    No.

20       Q    You were asked in your previous day of

21   deposition what harm is associated with the group that

22   needs to discuss tolerance and equality for a specific

23   group as opposed to a tolerance and equality for all

24   students in general.

25            MR. GIBBS:  Is there a page reference?

1          MR. ROSENWALD:  57, Line 25.

2          MR. GIBBS:  Then it would carry over to

3      Page 58.  The objection would be the inclusion or

4      exclusion of a specific group of students.  So,

5      those are the --

6          MR. CHOE:  I'll note for the record that the

7      witness has had a chance to read along with the

8      deposition transcript.

9  BY MR. ROSENWALD:

10     Q    My question is, is there any other harm that

11 would be associated with a group that meets to discuss

12 tolerance and equality for a specific group as opposed

13 to tolerance and equality of just all students in

14 general then what you've already stated?

15     A    I believe I stated in my previous day of

16 deposition the list of reasons for our concern about

17 anything going away from our abstinence-only policy and

18 that list include and it was an interrogatory for all

19 of the preventions that we are talking about, as our

20 goals, that's why we focused on abstinence only.

21 That's why we do not promote nor do we want to provide

22 a forum for students to just have conversations among

23 themselves about sexual orientation, sexual behavior,

24 sexual activities.

25     Q    Anything else?

1    A    No.

2    Q    Have any student organizations at Okeechobee

3  High School been organized at the suggestion of an

4  outside organization?

5    A    Not to my knowledge.

6    Q    Has any student organization at Okeechobee

7  High School been initiated by School Board employees?

8    A    Not to my knowledge.

9    Q    Does the School Board of Okeechobee County

10  sponsor any extra-curricular activities?  Let me repeat

11  that.

12        Does SBOC sponsor any extra-curricular

13  activities?

14    A    We provide opportunities for extra curricular

15  activities.

16    Q    I understand that, but does SBOC actually

17  sponsor any extra-curricular activities?

18                (Mr. Conely entered the deposition

19                room.)

20    A    My definition of sponsor is to provide funds,

21  to provide actual involvement of leadership to

22  activities.

23        We have sporting events, we provide all kinds

24  of opportunities for students to be involved in

25  extra-curricular activities.  We provide those

1    opportunities.

2         Q     So SBOC sponsors, for instance, football?

3         A     I think the term "sponsor" is problematic.

4    We provide those opportunities for the students to

5    participate in those activities.

6         Q     Does SBOC provide money for the football

7    program at Okeechobee High School?

8         A     No.  It's self-supporting.

9         Q     How does it support itself?

10        A     Fund raising, gate receipts, ticket receipts.

11        Q     Does SBOC provide leadership for the football

12   program?

13        A     Coaches are named for the football program.

14        Q     Are the coaches SBOC employees?

15        A     Not all of them, no.

16        Q     Are any of them?

17        A     Yes.

18        Q     What about the homecoming.  Does SBOC sponsor

19   the homecoming?

20        A     Homecoming is another activity that is

21   allowed.  That's an activity that is provided for

22   students to participate.

23        Q     But SBOC does not sponsor homecoming?

24        A     Again, I have a problem with the word

25   "sponsor."

1    behavior.

2         Q     Anything else?

3         A     No.

4         Q     Does Defendant have any reason to believe

5    that anyone associated with GLSEN has ever acted

6    inappropriately with a student?

7         A     I don't know.

8         Q     Is there a danger that involvement with GLSEN

9    might present to GSA participants that other national

10   organizations would not present to other student

11   groups?

12        A     I don't know.

13             MR. GIBBS:  It's 10:20.  Take a five minute

14        break?  Let's take a break.

15                  (There was a short break.)

16   BY MR. ROSENWALD:

17        Q     Does SBOC contend that Eric McCool's

18   communication with Yasmin Gonzalez justifies denial of

19   access to the Okeechobee GSA today?

20        A     The denial of GSA was based on our abstinence

21   policy, Florida Statutes, our curriculum that we base

22   our Life Management course on.  All of those things.

23             We are concerned about providing a forum for

24   students to discuss sex or be talking about sexual

25   orientation and any outside adult that has information

1          Is that the question?

2          MR. ROSENWALD:  Sure.  Okay.

3          THE WITNESS:  Yes.  But, again, I need to

4     look at the purpose of a club.  I need to look at

5     the reasons that they want to exist and in my

6     opinion if they came to me and said we want to

7     form a teen pregnancy prevention club, I would say

8     no because you have venues in your classroom and

9     in your guidance department and through your

10     parents to discussion those issues.

11  BY MR. ROSENWALD:

12     Q    Can you think of any specific club that you

13  know of that either was or is in existence that would

14  be categorized as a sex-based club besides the GSA?

15     A    Not that I'm aware of.

16     Q    When was the first time you heard the term

17  "sex-based" club?

18     A    I don't recall.

19     Q    Was it since the formation of this lawsuit --

20  the formation of this club?  Sorry.

21          MR. GIBBS:  I'm going to object; compound.

22     I'm not quite sure what the question was.  You

23     said the "lawsuit," then you said the "club."

24  BY MR. ROSENWALD:

25     Q    Did you hear the term sex-based club before

1        beliefs prohibit them from saying the Pledge of

2        Allegiance, we give them the option to not

3        participate because it's a religious freedom.

4   BY MR. ROSENWALD:

5        Q    Does Defendant require parental permission in

6   order to exercise the right to refuse to say the Pledge

7   of Allegiance?

8        A    Parent permission?

9        Q    Yes.

10       A    Not to my knowledge.

11       Q    Do you know if membership in the GSA has

12  dropped because of the permission slip requirement?

13           MR. GIBBS:   Object.

14           THE WITNESS:   I have no idea.

15  BY MR. ROSENWALD:

16       Q    Is the permission slip policy intended to

17  inform parents about their student's participation in

18  clubs?

19       A    Not to inform parents but to provide parents

20  the opportunity to give permission or not give

21  permission.

22       Q    Anything else?

23       A    No.

24       Q    Does Okeechobee County School Board have an

25  abstinence-only education policy?

206

```
 1        A     Yes.

 2        Q     What does abstinence-only education mean?

 3        A     Abstinence-only is curriculum that focuses on

 4   abstinence for our students.

 5        Q     Anything else?

 6        A     No.

 7        Q     Does Florida law require teaching

 8   abstinence-only curriculum?

 9             MR. GIBBS:  I'm going to object, calls for a

10        legal conclusion.

11             You can give your opinion as to Florida law.

12             THE WITNESS:  The Sunshine State Standards

13        and Florida Statute -- I believe I answered this

14        question in my previous -- the previous part of my

15        deposition require that we teach abstinence

16        based -- abstinence-only as the acceptable mode of

17        instruction.

18   BY MR. ROSENWALD:

19        Q     Let me ask you this.  Does Florida law allow

20   comprehensive sex education?

21             MR. GIBBS:  Object; also calls for a legal

22        conclusion but you can go ahead and give your

23        opinion.

24             MR. ROSENWALD:  I want your understanding of

25        the law.
```

1              MRS. WELLER:  If you know.

2              THE WITNESS:  I'm not sure how it's stated.

3       I don't know, really --

4    BY MR. ROSENWALD:

5       Q    Does Defendant think that Florida law forbids

6    it to engage in comprehensive sex education?

7              MR. GIBBS:  I'm going to object.

8              THE WITNESS:  I don't know.  I'm sorry.

9              MR. GIBBS:  I was going to say she answered

10       that already.  She doesn't know.

11    BY MR. ROSENWALD:

12       Q    Does Defendant try to discourage teen

13    pregnancy by teaching that if you have sex you can get

14    pregnant?

15       A    The teaching of abstinence-only is you don't

16    have sex.  To me, having sex is the only way you get

17    pregnant -- I mean -- one way or the other.

18       Q    Is the core of abstinence education the

19    message that if you have sex you get pregnant?

20       A    The core of abstinence-only is to teach

21    students they have a choice to abstain from having sex.

22       Q    Is that because one of the consequences of

23    having sex is that you may get pregnant?

24       A    One of the consequences.  Absolutely.

25       Q    Do they teach that consequence?

208

1        A      I would have to look at the life management

2   and health curriculum but if it's included in the

3   Sunshine State Standards and it's a part of our

4   curriculum, I would say that it's taught.

5        Q      Does Defendant try to discourage drinking and

6   driving by discussing the fact that if you drink you

7   could get into an accident?

8             MR. GIBBS:   Object but go ahead.

9   BY MR. ROSENWALD:

10       Q      This isn't a trick question.

11       A      I'm trying to remember the reference.   In our

12  Code of Student Conduct, there is an entire page

13  devoted to alcohol and alcohol use by underage

14  students.

15       Q      Does that instruction discourage drinking and

16  driving by discussing the fact that if you drink you

17  could get into a car accident?

18       A      We have had programs that show students --

19  teach students that alcohol and driving can produce

20  terrible consequences.   We have actually had students

21  in the past die as a result of alcohol-related

22  accidents.

23             So I would say it has been discussed, it has

24  been used as an example in programs and assemblies and

25  the idea of any teenager -- any underage person

1    drinking is absolutely a serious concern of ours.

2         Q    Does Defendant allow a prom to take place on

3    School grounds?

4         A    Proms have been held on School grounds.

5         Q    Is there any problem with that?  Would

6    Defendant permit a prom on School grounds today?

7         A    As an activity for all students, yes, it

8    would be allowed.

9         Q    Does Defendant permit an activity naming club

10   sweethearts?

11        A    As far as I know the last few years that has

12   not been an activity.

13        Q    Would Defendant permit club sweethearts

14   today?

15        A    I'd have to look at the request.

16        Q    Tell me what your understanding of what club

17   sweethearts are.

18        A    You want to talk ancient history?  I can talk

19   ancient history because it was done when I was in

20   school.

21             MR. GIBBS:  I'm going to object.

22   BY MR. ROSENWALD:

23        Q    I'm going to direct your attention to the

24   2007 school yearbook of Okeechobee High School and I am

25   going to ask you to identify the caption.

1      Q     Is there anything objectionable about it?

2      A     Looking at this picture and looking at

3  Florida High School Rodeo Team, Rodeo Sweethearts, the

4  way I'm looking at it, no, it's not objectionable.

5      Q     Does this picture refresh your memory in any

6  way as to what club sweethearts are?

7      A     Club sweethearts, as I understand them, are

8  the most popular girl or the most popular boy for a

9  club.

10     Q     Anything else?

11     A     No.

12     Q     Is the selection of club sweethearts

13 sex-based based upon any sexual grouping, orientation

14 or activity of any kind?

15     A     It has to do with the popularity of the boy

16 or the girl.  It's the gender.  It doesn't have

17 anything to do with sex.

18     Q     So just to clarify, the club sweethearts does

19 not violate School Board Policy 4.30(D)?

20     A     Correct.

21     Q     You may have said this but just one question.

22 Does Defendant permit the Miss Senior contest today?

23     A     That is an activity at Okeechobee High School

24 that is approved, permitted by the Principal.

25     Q     Does Defendant permit powder puff football

1    activity today?

2        A    Again, that is an activity that has been

3    permitted at Okeechobee High School for many, many

4    years.

5        Q    I would like to direct your attention to what

6    I would ask the court reporter to mark as 14.

7                    (Cooper Exhibit Number 14 was

8                    marked for identification.)

9    BY MR. ROSENWALD:

10       Q    Miss Wiersma, you've looked at --

11   Dr. Cooper --

12           MR. GIBBS:  I object.

13   BY MR. ROSENWALD:

14       Q    Dr. Cooper, as you're flipping through this

15   document now, have you ever seen it before?

16       A    (The witness reviewed the document.)  I've

17   glanced through this, yes.

18       Q    When was the first time that you saw it?

19       A    I don't remember.  I have no idea.

20       Q    Was it within the last week?

21       A    I don't know.

22       Q    Could it have been longer than six months

23   ago?

24       A    I don't know that either.

25       Q    Do you remember how it was brought to your

1    attention?

2         A    No.

3         Q    Is the fact that transgender issues might be

4    discussed at an Okeechobee GSA meeting an independent

5    reason to deny access to the Okeechobee GSA?

6         A    I go back to what I previously stated.    If

7    it's a conversation that we are providing a forum for

8    that discusses sexual orientation, sexual activity,

9    sexual behavior, it would be prohibited.    It would be a

10   problem.

11        Q    Anything else?

12        A    No.

13        Q    Are discussions about the rights of

14   transgendered students a problem that falls into one of

15   the categories that you've just talked about?

16        A    Discussions revolving around sexual

17   orientation, sexual behavior, sexual activity are a

18   problem.

19        Q    Anything else?

20        A    No.

21        Q    Does Defendant contend that any activity or

22   materials provided by GLSEN to the Okeechobee GSA

23   justifies its decision to deny access?

24        A    The decision to deny access was based on our

25   policy, Florida Statute and what we considered to be in

```
1    that you read -- that your counsel read previously?
2         A    Well, their word "Set" is there, the word
3    "Go" is there.  It discusses the process and then all
4    of those questions are asked.
5              MR. GIBBS:  If we're going to -- the activity
6         speaks for itself but if you want it all read -- I
7         mean, it speaks to have them at some point voice
8         aloud, discuss it.  These are talking points and
9         these are the issues.
10   BY MR. ROSENWALD:
11        Q    Does the "ready" material that you read
12   suggest that there are some topics that are
13   inappropriate to ask transgender people?
14        A    The last statement says "transgender people
15   also often receive and are expected to answer questions
16   about personal information which is no one's business
17   but theirs."
18        Q    Anything else?
19        A    No.
20        Q    Has the Okeechobee GSA ever used or proposed
21   to use this activity as a GSA meeting?
22        A    I don't know.
23        Q    Do you have any information to suggest that
24   they have?
25        A    No.
```

```
1    to prepare students for careers as farmers?

2         A    One purpose is to prepare them for careers of

3    any kind.  They might think they want to be a farmer

4    today and tomorrow decide they want to go into business

5    management.  The things that are provided in terms of

6    experiences in FFA are for future preparation of

7    students for careers in businesses not limited to

8    agriculture.

9         Q    Is one purpose to prepare them for careers --

10        A    It could be.

11        Q    -- as farmers?

12        A    (Nods head.)

13        Q    You're saying yes?

14        A    I don't mean to interrupt.  Yes, it could be.

15        Q    Is Future Farmers of America a national

16   group?

17        A    Yes, it is.

18        Q    The Okeechobee Future Farmers of America

19   interact with the National Future Farmers of America?

20        A    The Future Farmers of America hold

21   competitions all over within the State of Florida and

22   nationally.  So they do have a chapter that is

23   affiliated with the national organization.

24        Q    Do other chapters from other schools -- do

25   other chapters of Future Farmers of America from other
```

1    schools go to those competitions sponsored by the

2    National Future Farmers of America?

3        A    Yes, they do.

4        Q    I am going to show you Exhibit 15.

5                     (Cooper Exhibit Number 15 was

6                     marked for identification.)

7    BY MR. ROSENWALD:

8        Q    Have you seen this article before?

9        A    (The witness reviewed the document.)  Yes, I

10   believe I have.

11       Q    If you want a chance to skim it to refresh

12   your memory, I'm going to ask you, is Defendant aware

13   of the incidents of harassment alleged in this article?

14            I guess we can start with Stan Madray from

15   the class of 1980.

16       A    I was not here during that time.

17       Q    Is Defendant School Board of Okeechobee

18   County aware of the harassment outlined in this story

19   against Stan Madray in the class of 1980?

20       A    (The witness reviewed the document.)  Based

21   on the information of this article, it produced -- the

22   statements here produced an awareness.

23            MR. GIBBS:  Are you asking her to verify if

24        Danny Mullins, the former superintendent -- her

25        predecessor -- who was there from April 18, 1983

231

```
              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF FLORIDA

           Case No. 06-14320-Civ-Moore/Lynch

GAY-STRAIGHT ALLIANCE OF
OKEECHOBEE HIGH SCHOOL, et al.,

      Plaintiffs,

vs.                                    CERTIFIED COPY

SCHOOL BOARD OF OKEECHOBEE
COUNTY,
      Defendant.
_____  /

           DEPOSITION OF:  DR. PATRICIA COOPER
                    VOLUME III
DATE:              February 8, 2008
TIME:              1:30 p.m. to 5:20 p.m.
PLACE:             410 NW 6th Street
                   Okeechobee, Florida

TAKEN BY:          Amy J. Schreck, Registered Professional
                   Reporter and Notary Public, State of Florida
                   at Large

APPEARANCES:
FOR PLAINTIFFS:      Robert Rosenwald, Jr., Esquire
                     American Civil Liberties Union
                     4500 Biscayne Boulevard, Suite 340
                     Miami, Florida 33137
                     (786)363-2713

                     Ken Choe, Esquire
                     American Civil Liberties Union
                     125 Broad Street, 18th Floor
                     New York, New York 10004
                     (212)549-2553
```

```
1   any kind of -- any one of these enumerated categories.
2        Q    So I'm clear, the enumeration categories of
3   protected classes of students in Policy 6.43 does not
4   weaken or interfere with the School's zero tolerance of
5   harassment policy.  Correct?
6        A    Correct.
7        Q    I'm going to ask you about a series of
8   questions about a bunch of documents.  I told you this
9   before.  I'll remind you that any time I say the word
10  "you," I mean Defendant or anyone on behalf of
11  Defendant.
12            Do you understand that?
13       A    Yes.
14       Q    Who printed out the documents that were
15  provided to Plaintiffs in discovery by the Defendant?
16       A    I'm not sure.  There are many documents.  We
17  printed some, the High School printed some, my student
18  information system department printed some.  So, there
19  are many of us working on this to produce those
20  documents.
21       Q    Have you ever heard of Wilton High School in
22  Connecticut?
23       A    Wilton High School in Connecticut?
24       Q    Yes.
25       A    I think I vaguely remember that name, yes.
```

1      Q    Do you remember seeing any one of them

2   specifically yourself personally?

3      A    I believe the Wilton High School one.

4      Q    When do you remember seeing that?

5      A    I have no idea.

6      Q    Anything else?

7      A    No.

8      Q    Does Defendant -- has Defendant ever seen

9   these web sites?

10         MR. GIBBS:   Object; asked and answered but go

11      ahead.

12         THE WITNESS:   The personal going to these web

13      sites I don't recall doing but I know that Miss

14      Wiersma and I had many, many discussions about web

15      sites containing this kind of information.

16   BY MR. ROSENWALD:

17      Q    Who printed this material out?

18      A    I don't know.   Like I told you earlier, there

19   are several people that we had helping us with the

20   research.   I don't know who printed these all out.

21      Q    Was the computer equipment used for doing

22   this search equipped with filtering software?

23      A    I don't know.

24      Q    Who performed the underlying search to find

25   the document represented in Cooper 19?

257

```
1    the research that produced these documents use?
2         A    Well, I would have to go through each one and
3    hone down into the original site.
4         Q    Is it your understanding that somebody typed
5    in the address of the site in order to get there or --
6         A    No.  They can type in terms.  I understand
7    that.
8         Q    Do you know what those terms were?
9         A    No.
10        Q    Did Defendant perform any research of any
11   other clubs' web sites besides those that are produced
12   in Cooper 19?
13             MR. GIBBS:  Object; asked and answered.
14             THE WITNESS:  I would say that there was a
15        lot of research early on, there's been research
16        continuing.  We continue to look at research and
17        documents.  This is just a representation of the
18        numerous things that we looked at and discussed.
19   BY MR. ROSENWALD:
20        Q    Why were these documents printed out and
21   included in discovery but other sites that Defendant
22   visited were not?
23        A    I would say this represents many of the sites
24   that were visited and discussed.  These are
25   representations of those.
```

258

1     Q    What else specifically was seen by Defendant

2  in its research?

3     A    Again, many, many sites, many documents, many

4  articles were seen.  I can't enumerate on all of them.

5     Q    Anything else?

6     A    No.

7     Q    How many hyperlinks from the original search

8  term results did the researcher have to click on in

9  order to get to the sites that are represented in

10  Cooper 19?

11     A    There could have been numerous.

12     Q    As you sit here today, you have no idea?

13     A    No, I don't.

14     Q    The School Board of Okeechobee County

15  produced these documents in response to our request for

16  all copies of any web pages of any person or

17  organization that Defendant contends supports its

18  decision to deny access to the GSA.

19        How does the web site of the Wilton High

20  School GSA in Connecticut which is the first document

21  that you have -- it's Bates Stamped 559 to 582 -- is

22  how they were grouped in your production.

23        How does that bundle of papers support SBOC's

24  denial of access to the Okeechobee GSA?

25     A    Again, I would say it's representative of the

1    sites, of the articles, of the research that was

2    conducted.

3         Q    Is there anything problematic about this web

4    site that you feel provides a basis to deny access to

5    the Okeechobee GSA?

6         A    (The witness reviewed the document.)  There's

7    several references to GLSEN, there's several references

8    to sexual identity and gender identity, glossary for

9    and about the lesbian, gay, bisexual transgender

10   community, coming out, gay, lesbian politics and law,

11   gay and lesbian adolescence, Harvard gay and lesbian

12   caucus and several others.

13        Q    Anything else?

14        A    No.

15        Q    Could you turn to Bates Stamp 573?  Can you

16   tell me what this web site is?

17        A    Www.ctgay.com.outspoken/index/htm.

18        Q    How did you -- how did Defendant come across

19   this web site?

20        A    Again, it looks like there were several sites

21   visited, several links visited.

22        Q    What search did Defendant perform to arrive

23   at this site?

24        A    As I said before, there were many searches,

25   many -- much research done, many documents reviewed.  I

1  don't know specifically what search was done.

2      Q    Does SBOC contend that this web site provides

3  some independent basis to deny access to the Okeechobee

4  GSA?

5      A    Going back to our rationale, abstinence

6  policy, Board policy, Florida Statute and our feeling

7  and our opinion that anything relating to sexual

8  orientation, sexual behavior, sexual activity is a

9  reason for us to deny, then -- yes -- there's specific

10  references here to gay boy, homosexuality, personals,

11  make money, sex finder, anal, dildo.

12      Q    Anything else?

13      A    No.

14      Q    Take a look at 574 to 578.  Does the same

15  answer apply to all of these?

16      A    (The witness reviewed the document.)  Yes.

17      Q    Anything else?

18      A    No.

19      Q    Turn to Bates 579.  Tell me what search

20  Defendant performed to arrive at this web site.

21      A    I don't know what terms were put in to do the

22  search.  Again, there were many of them.

23      Q    Does Defendant contend that the web site

24  gender.eserver.org provides an independent basis to

25  deny access to the Okeechobee GSA?

262

```
 1  sites.  Correct?

 2       A    Yes.

 3       Q    Who did that research?

 4       A    Miss Wiersma and I discussed much of it, so I

 5  would say a lot of it she probably did.

 6       Q    Anybody else?

 7       A    No.  No, there was no one else.

 8       Q    Just to clarify, you are not aware of any

 9  link to the Okeechobee GSA web site for any of this

10  material?

11       A    No.

12       Q    Are you aware of any specific connection to

13  the Okeechobee GSA at all for this material?

14       A    Again, I would say that a lot of this was

15  done in our research --

16       Q    I understand.

17       A    -- even prior to making a decision.  So in

18  terms of a specific awareness, no.

19       Q    If you could turn to Bates 583 to 584 which

20  is one piece of paper front and back, tell me what

21  search Defendant performed to arrive at this web site.

22       A    (The witness reviewed the document.)  I don't

23  know what the initial terms were put in but this looks

24  like a My Space.

25       Q    Do you know how many clicks between links
```

1    working on their portfolios.  Their portfolios could be

2    in an art class or from an art class to be presented in

3    an application for a scholarship for entrance into a

4    college.

5            So, these were connections of student

6    activities, student clubs and organizations to existing

7    curricula.

8        Q    Anything else?

9        A    No.

10       Q    Is the subject of student government taught

11   in any regularly scheduled class at Okeechobee High

12   School?

13       A    The subject of student government.

14   Government is taught in American History, in World

15   History.  It's taught in World Cultures and student

16   government is student organization that indicates to

17   the students how a government might be run with

18   officers and so forth.

19       Q    Is there any class that teaches specifically

20   student government?

21           MRS. WELLER:  I think she's answered that.

22           THE WITNESS:  There's no specific class but

23      the concepts of student government are taught in a

24      number of different classes.

25   BY MR. ROSENWALD:

1    Q    Is a class teaching specifically student

2  government planned for any time in the future at

3  Okeechobee High School?

4    A    Not to my knowledge.

5                          (Cooper Exhibit Number 30 was

6                          marked for identification.)

7  BY MR. ROSENWALD:

8    Q    I'm going to show you what I'm going to mark

9  as Cooper 30 and ask you to take a look at it.  This is

10  an e-mail from Toni Wiersma to Patricia Cooper on

11  October 12, 2006 at 4:16 p.m.  Forwards a message from

12  Tealia DeBerry to Toni Wiersma sent that same day from

13  DeBerry to Wiersma at 4:22 p.m. and the subject is

14  "SAGA."

15          MRS. WELLER:  Can we note that this is the

16      same e-mail as on 10/11 from Tealia DeBerry?  It's

17      the exact same e-mail probably just forwarded to

18      somebody else.  I don't know what exhibit that

19      was.

20          Do you have that number?

21  BY MR. ROSENWALD:

22    Q    Does this appear to be what was previously

23  marked as Cooper 27 an e-mail just forwarded then from

24  Toni Wiersma to you, Patricia Cooper?

25    A    (The witness reviewed the document.)  Yes.

```
1    provider, they would be making those payments.

2         Q    So you either have or will make a claim to

3    the insurance company for payment in this case for

4    costs associated with the defense of the case; is that

5    right?

6         A    Ask the question again, please.

7         Q    You either have or will make a claim for

8    reimbursement for costs associated with the defense of

9    this case.  Correct?

10        A    Yes, I would say that is correct.

11             MR. ROSENWALD:  Counsel, will you agree to

12        provide a copy of the insurance policy that has

13        been referenced?

14             MR. GIBBS:  Sure.

15             MR. ROSENWALD:  Thank you.

16   BY MR. ROSENWALD:

17        Q    Was the fact that Tealia DeBerry was proposed

18   by the GSA as an adviser a factor in your decision to

19   deny access to the Okeechobee GSA?

20        A    No.

21        Q    Is the choice of Tealia DeBerry as a sponsor

22   a basis to deny the Okeechobee GSA today?

23        A    The basis of the denial goes back to our

24   abstinence policy, our School Board policies and our

25   feeling that this Club is not in the best interests of
```

1    our students.

2         Q      Anything else?

3         A      No.

4                MR. ROSENWALD:  Can we take a short break?

5                        (There was a short break and there

6                        were remarks off the record.)

7    BY MR. ROSENWALD:

8         Q      Has Defendant ever performed research that

9    led it to East Grand Rapids High School Gay-Straight

10   Alliance?

11        A      I don't remember.

12        Q      Do you know what search terms were employed

13   if Defendant did do a search that led it to the Grand

14   Rapids Gay-Straight High School Alliance?

15        A      No.  I don't remember.

16        Q      Do you know how many clicks it took to get

17   from the search terms to the pages representing the

18   East Grand Rapids High School Gay-Straight Alliance?

19        A      No, I do not know.

20        Q      Did the Okeechobee GSA ever propose to link

21   in any way to the East Grand Rapids High School

22   Gay-Straight Alliance?

23        A      I don't know.

24        Q      Does the East Grand Rapids High School

25   Gay-Straight Alliance web site provide any independent

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 06-14320-Civ-Moore/Lynch

GAY-STRAIGHT ALLIANCE OF
OKEECHOBEE HIGH SCHOOL, et al.,

      Plaintiffs,

vs.

SCHOOL BOARD OF
OKEECHOBEE COUNTY,

      Defendant.

_____/

## NOTICE OF DEFENDANT'S DEPOSITION

**PLEASE TAKE NOTICE** that, pursuant to Rule 30(b)(6) of the Federal Rules

of Civil Procedure, the undersigned will take the deposition of Defendant School Board

of Okeechobee County upon oral examination before a notary public or other officer

authorized by law to take depositions in the State of Florida on the dates and at the times

and places indicated:

| Witness | Date/Time | Place |
|---|---|---|
| **Defendant's representative(s) with the most knowledge of the items listed below** | **December 11, 2007 9:00 am** | **Law Offices of Tom Conely 401 NW 6th Street Okeechobee, FL 34973** |

Pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, the deponent

shall designate one or more of its officers, directors, or managing agents or other persons

who can testify on its behalf concerning the following:

EXHIBIT
Cooper 1
12.11.07
PENGAD-Bayonne, N.J.

1.      Defendant's policies and/or practices concerning curricular and non-curricular student groups since the start of the 2006-2007 school year, including, but not limited to, policies/or practices adopted on or about October 8, 2007.

2.      Defendant's refusal to permit Plaintiff Gay-Straight Alliance of Okeechobee High School to meet on school premises during non-instructional time at Okeechobee High School absent a court order requiring Defendant to do so, including, but not limited to, all reasons therefor.

3.      Defendant's knowledge and/or understanding of the mission, discussions, and activities of Plaintiff Gay-Straight Alliance of Okeechobee High School.

4.      Defendant's knowledge and/or understanding of gay-straight alliances other than Plaintiff Gay-Straight Alliance of Okeechobee High School, and of any national organization affiliated with gay-straight alliances.

5.      Defendant's policies and/or practices concerning student harassment since the start of the 2004-2005 school year.

6.      Student harassment based on actual or perceived sexual orientation at Okeechobee High School since the start of the 2004-2005 school year.

7.      Defendant's teaching concerning abstinence and/or sex education since the start of the 2006-2007 school year, including, but not limited to, the identities of the faculty members responsible for such teaching, and all materials concerning abstinence and/or sex education, whether or not specific to a class.

8.      The curricular and non-curricular student groups that Defendant has permitted to meet on school premises during non-instructional time at Okeechobee High

School since the start of the 2006-2007 school year in general, and the following student groups in particular:

- JROTC;

- Cheerleading Squad;

- Rodeo Team;

- student group affiliated with the following activity:  prom;

- student group affiliated with the following activity:  compatibility survey (Latin Club);

- student group affiliated with the following activity:  Valentine's Day roses (Beta Club);

- Student Council;

- student group affiliated with the following activity:  homecoming;

- student group affiliated with the following activity:  student auction;

- student group affiliated with the following activity:  Miz Senior contest;

- student group affiliated with the following activity:  powderpuff football game;

- student group affiliated with the following activity:  graduation Kiss-a-Senior-Goodbye roses.

The deponent should be able to testify regarding the identities of the faculty advisors to each student group, and the missions, discussions, and activities of each student group.

9.     The reasons for any denial of any of Plaintiff's requests for admission.

10.     The disciplinary history of all members of Plaintiff Gay-Straight Alliance of Okeechobee High School.

Dated:  November 29, 2007
Miami, FL

Robert F. Rosenwald, Jr. (FL Bar No. 0190039)
rrosenwald@aclufl.org
Randall C. Marshall (FL Bar No. 0181765)
rmarshall@aclufl.org
American Civil Liberties Union Foundation
of Florida
4500 Biscayne Boulevard, Suite 340
Miami, FL 33137
Telephone: (786) 363-2713
Facsimile: (786) 363-1392
Attorneys for Plaintiffs Gay-Straight Alliance
of Okeechobee High School, et al.

## Certificate of Service

**I hereby certify** that a true and correct copy of the foregoing was served by mail on November 29, 2007, on all counsel or parties of record on the attached service list.

Robert F. Rosenwald, Jr.

4

**SERVICE LIST**

**Case No. 06-14320-Civ-Moore/Lynch**

David C. Gibbs, III
dgibbs@gibbsfirm.com
Barbara J. Weller
bweller@gibbsfirm.com
Gibbs Law Firm, P.A.
5666 Seminole Boulevard, Suite 2
Seminole, FL 33772
Telephone: (727) 399-8300
Facsimile: (727) 398-3907
Attorneys for Defendant School Board of Okeechobee County

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 06-14320-Civ-Moore/Lynch

GAY-STRAIGHT ALLIANCE OF
OKEECHOBEE HIGH SCHOOL, et al.,

     Plaintiffs,

vs.

SCHOOL BOARD OF
OKEECHOBEE COUNTY,

     Defendant.

_____/

## NOTICE OF DEFENDANT'S DEPOSITION

**PLEASE TAKE NOTICE** that, pursuant to Rule 30(b)(6) of the Federal Rules

of Civil Procedure, the undersigned will take the deposition of Defendant School Board

of Okeechobee County upon oral examination before a notary public or other officer

authorized by law to take depositions in the State of Florida on the dates and at the times

and places indicated:

| Witness | Date/Time | Place |
|---|---|---|
| **Defendant's representative(s) with the most knowledge of the items listed below** | **February 8, 2008 8:00 am** | **Law Offices of Tom Conely 401 NW 6th Street Okeechobee, FL 34973** |

Pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, the deponent

shall designate one or more of its officers, directors, or managing agents or other persons

who can testify on its behalf concerning the following:



1.      Defendant's policies and/or practices concerning curricular and non-curricular student groups since the start of the 2006-2007 school year, including, but not limited to, policies/or practices adopted on or about October 8, 2007.

2.      Defendant's refusal to permit Plaintiff Gay-Straight Alliance of Okeechobee High School to meet on school premises during non-instructional time at Okeechobee High School absent a court order requiring Defendant to do so, including, but not limited to, all reasons therefor.

3.      Defendant's knowledge and/or understanding of the mission, discussions, and activities of Plaintiff Gay-Straight Alliance of Okeechobee High School.

4.      Defendant's knowledge and/or understanding of gay-straight alliances other than Plaintiff Gay-Straight Alliance of Okeechobee High School, and of any national organization affiliated with gay-straight alliances.

5.      Defendant's policies and/or practices concerning student harassment since the start of the 2004-2005 school year.

6.      Student harassment based on actual or perceived sexual orientation at Okeechobee High School since the start of the 2004-2005 school year.

7.      Defendant's teaching concerning abstinence and/or sex education since the start of the 2006-2007 school year, including, but not limited to, the identities of the faculty members responsible for such teaching, and all materials concerning abstinence and/or sex education, whether or not specific to a class.

8.      The curricular and non-curricular student groups that Defendant has permitted to meet on school premises during non-instructional time at Okeechobee High

School since the start of the 2006-2007 school year in general, and the following student

groups in particular:

- JROTC;

- Cheerleading Squad;

- Rodeo Team;

- student group affiliated with the following activity: prom;

- student group affiliated with the following activity: compatibility survey
  (Latin Club);

- student group affiliated with the following activity: Valentine's Day roses
  (Beta Club);

- Student Council;

- student group affiliated with the following activity: homecoming;

- student group affiliated with the following activity: student auction;

- student group affiliated with the following activity: Miz Senior contest;

- student group affiliated with the following activity: powderpuff football
  game;

- student group affiliated with the following activity: graduation Kiss-a-Senior-
  Goodbye roses.

The deponent should be able to testify regarding the identities of the faculty advisors to

each student group, and the missions, discussions, and activities of each student group.

    9.     The reasons for any denial of any of Plaintiff's requests for admission.

    10.    The disciplinary history of all members of Plaintiff Gay-Straight Alliance

of Okeechobee High School.

10(a).   The topics identified in Supplemental Notice of Defendant's Deposition.

Dated:   February 1, 2008
          Miami, FL

_____

Robert F. Rosenwald, Jr. (FL Bar No. 0190039)
rrosenwald@aclufl.org
Randall C. Marshall (FL Bar No. 0181765)
rmarshall@aclufl.org
American Civil Liberties Union Foundation
 of Florida
4500 Biscayne Boulevard, Suite 340
Miami, FL 33137
Telephone: (786) 363-2713
Facsimile: (786) 363-1392

Kenneth Y. Choe
kchoe@aclu.org
James D. Esseks
jesseks@aclu.org
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2627
Facsimile: (212) 549-2650

Attorneys for Plaintiffs Gay-Straight Alliance
 of Okeechobee High School, et al.

## Certificate of Service

    **I hereby certify** that a true and correct copy of the foregoing was served by mail on February 1, 2008, on all counsel or parties of record on the attached service list.

_____

Robert F. Rosenwald, Jr.

## SERVICE LIST

### Case No. 06-14320-Civ-Moore/Lynch

David C. Gibbs, III
dgibbs@gibbsfirm.com
Barbara J. Weller
bweller@gibbsfirm.com
Gibbs Law Firm, P.A.
5666 Seminole Boulevard, Suite 2
Seminole, FL 33772
Telephone: (727) 399-8300
Facsimile: (727) 398-3907
Attorneys for Defendant School Board of Okeechobee County

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 06-14320-Civ-Moore/Lynch

GAY-STRAIGHT ALLIANCE OF
OKEECHOBEE HIGH SCHOOL, et al.,

     Plaintiffs,

vs.

SCHOOL BOARD OF
OKEECHOBEE COUNTY,

     Defendant.

_____/

## SUPPLEMENTAL NOTICE OF DEFENDANT'S DEPOSITION

**PLEASE TAKE NOTICE** that, pursuant to Rule 30(b)(6) of the Federal Rules

of Civil Procedure, the undersigned will take the deposition of Defendant School Board

of Okeechobee County upon oral examination before a notary public or other officer

authorized by law to take depositions in the State of Florida on the dates and at the times

and places indicated:

| Witness | Date/Time | Place |
|---|---|---|
| **Defendant's representative(s) with the most knowledge of the items listed below** | **February 8, 2008 8:00 a.m.** | **Law Offices of Tom Conely 401 NW 6th Street Okeechobee, FL 34973** |

     Pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, the deponent

shall designate one or more of its officers, directors, or managing agents or other persons

who can testify on its behalf concerning the following:

     11.    The documents produced by Defendant in response to Plaintiffs' Request

for Production of Documents No. 14, including the identities of the persons who



generated the documents, the processes by which the documents were generated, and the relevance of the documents to Defendant's case.

12.    Club sweethearts and the process by which club sweethearts are chosen.

13.    Dates of meetings and number of student attendees at meetings during the spring 2006-2007 semester, fall 2007-2008 semester, and/or spring 2007-2008 semester at OHS for the following organizations:

      (a)    Color guard;

      (b)    Poetry Club;

      (c)    FBLA;

      (d)    Key Club;

      (e)    Art Club.

14.    As of the beginning of the 2007-08 school year, the total number of students enrolled at OHS, and the total number who were 14 or younger.

15.    The date of birth for each student who has turned in a permission slip during the spring and/or fall 2007 semesters at OHS for the Okeechobee GSA.

Dated:  January 30, 2008
      Miami, FL

_Robert Rosenwald_

_____

Robert F. Rosenwald, Jr. (FL Bar No. 0190039)
rrosenwald@aclufl.org
Randall C. Marshall (FL Bar No. 0181765)
rmarshall@aclufl.org
American Civil Liberties Union Foundation
 of Florida
4500 Biscayne Boulevard, Suite 340
Miami, FL 33137
Telephone: (786) 363-2713
Facsimile: (786) 363-1392

Kenneth Y. Choe
kchoe@aclu.org
James D. Esseks
jesseks@aclu.org
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2627
Facsimile: (212) 549-2650

Attorneys for Plaintiffs Gay-Straight Alliance
 of Okeechobee High School, et al.

## Certificate of Service

**I hereby certify** that a true and correct copy of the foregoing was served by mail on January 30, 2008, on all counsel or parties of record on the attached service list.

_____
Robert F. Rosenwald, Jr.

## SERVICE LIST

### Case No. 06-14320-Civ-Moore/Lynch

David C. Gibbs, III
dgibbs@gibbsfirm.com
Barbara J. Weller
bweller@gibbsfirm.com
Gibbs Law Firm, P.A.
5666 Seminole Boulevard, Suite 2
Seminole, FL 33772
Telephone: (727) 399-8300
Facsimile: (727) 398-3907
Attorneys for Defendant School Board of Okeechobee County

## Gay-Straight Allaince Constitution

The name of this club is the Gay-Straight Alliance (GSA).

The purposes of this club is:

Promoting tolerance and equality among students, regardless of sexual orientation and/or gender identities through awareness building and education.

To inform students of issues and events regarding lesbians, gays, bisexuals, transgendered, (LGBT) and straight allies.

To create a safe respectful learning enviornment for all students.

To work together with administration and other school clubs to end prejudice and harassment in school functions.

To create a safe place for LGBT and Straight Ally students to socialize about issues they have in common.

## Membership

Membership is open to all students and faculty members who are interested in the club.



# Gay Straight Alliance of Okeechobee High School Constitution

## Article I – Name

The name of this organization is the Gay-Straight Alliance (or "GSA") of Okeechobee High School.

## Article II – Purposes

The purposes of the GSA shall be:

To provide a social, emotional and educational safe environment for students who are gay, lesbian, bisexual, transgender, questioning, perceived as being any of the aforementioned, and their straight allies.

To build awareness in the school community of issues concerning and affecting the lives of students who are lesbian, gay, bisexual, transgender, questioning, perceived as any of the aforementioned, and their straight allies.

To reduce violence, harassment, bullying and discrimination based on sexual orientation and/or gender identity.

To encourage tolerance, acceptance and equality within the school community regardless of sexual orientation or gender identity.

To promote pride in our community.

## Article III – Membership

Section 1.  The GSA shall be a co-ed club open to all students currently attending Okeechobee High School who are interested in achieving greater awareness about gay, lesbian, bisexual, and transgender issues without regard to race, gender, sex, national origin, religion, physical ability, sexual orientation, gender identity or parental status.

Section 2.  Members are in no way obligated to declare or define their sexual orientation. No member may declare any assumption about another member's sexual orientation.

Section 3.  Meetings will be held as the club decides they should be held by vote and/or bylaws.  Anyone is welcome to attend any meeting, so long as he or she shows respect for all other members and obeys the rules and regulations of the club.  There are not attendance requirements for regular members.

EXHIBIT
Cooper 11
2-8-08

Section 4.  Any member may submit an agenda item to the president 24 hours before a scheduled meeting to have the item heard.  Every meeting shall also have an open forum where any member shall be entitled to address the membership.

Section 5.  Meetings and discussions shall be confidential, including the names of group members and anything said at the meetings.

Section 6.  Except as provided herein, Robert's Rules of Order shall govern all meetings.

### Article IV – Officers and Duties

Section 1.  The elected officers of the GSA shall consist of a president, vice president, secretary, and treasurer.

Section 2.  Duties of Officers

President.  The president shall be the chief executive and official representative of the GSA; preside over all of the GSA meetings and committee meetings, unless he or she appoints a chairperson; have the power to call special meetings of the GSA; produce and distribute an agenda for each meeting; organize all club activities; be the link between the club and the school administration; and have the power to withdraw funds from the GSA account with the treasurer's approval.

Vice President.  The vice president shall act as president in the absence of the president; assume the office of president in case of presidential removal (in case of a vacancy in the office of vice president, the president shall appoint a new vice president); assist in any duties deemed necessary by the president; be supervisor and counselor to all standing and special committees; and keep a written, accurate account of all committee progress.

Secretary.  The secretary shall keep written, accurate minutes of all official meetings of the club; type all documents, letters, etc., which the president might request; maintain a confidential permanent attendance record of the club privy to the viewing of the officers; be in charge of submitting club announcements; and maintain and make available an up-to-date calendar of club events.

Treasurer.  The treasurer shall be responsible for all financial business of the club; keep an accurate and current account of all receipts and disbursements and present a financial report to the president once a month; and be authorized to withdraw funds from the GSA account with the approval of the president.

Section 3.  Qualification of Office.  All members who are in good standing of the club shall be eligible to run for office.  All officers who are members in good standing shall be eligible for re-election.

Section 4.  Elections Procedure.  Elections shall be held in March of each school year. Nominations shall be taken two weeks prior to elections.  Nominees shall make a brief speech to the membership at the election meeting based on their qualifications for the desired office.

Election by secret ballot will be held with the winner taking the majority of the votes of the club members present on the date of elections. New officers will take their positions the first day of April. A special election meeting shall be held during the GSA's first year of organization at the earliest possible date, with the officers elected serving until the first day of April.

Section 5.  Vacancies.  With the exception of the vice president, if a vacancy occurs in any of the offices, a member with proper qualifications shall be elected for the remainder of the term, or, where applicable, the officer-elect shall immediately take office.

Section 6.  Removal from Office.  Any active member may petition for the involuntary removal of any officer at any regularly scheduled meeting: due to misconduct with respect to this constitution, school rules and/or community laws or due to inadequate performance of duties with respect to neglect of duty, inefficiency, and/or dishonesty. Involuntary removal shall only be effective with the vote of a 2/3 majority at the meeting of active members.  An officer may resign by submitting a formal letter of resignation to the officers.  An officer with more than three absences from obligatory meetings or activities per semester shall be required to resign.

## Article V – Voting

Section 1.  All officers, excluding the president, shall retain voting privileges.  The president may only vote in the event of a tie.

Section 2. The method used by members to express themselves is in the form of moving motions.  A motion is a proposal that the entire membership take action or a stand on any issue. Individual members can: 1) initiate motions, 2) second motions, 3) debate motions, and/or 4) vote on motions.

Initiating Motions:  Motions are presented by obtaining the floor.  Wait until the previous speaker is finished.  Address the president by saying, "I have a motion." When the president recognizes the member, he or she will make the motion by speaking in a clear and concise manner stating the motion affirmatively. Another member will second the motion or the president will call for a second.  If there is no second to the motion, it is lost. If it is seconded, discussion ensues, then the president calls for a vote.

Voting on a Motion:  The method of vote on any motion depends on the situation and may be: 1) By voice - The president asks those in favor to say, "aye," those opposed to say, "no." An abstention by any member is allowed.  Any member may move for an exact count.  The president will vote only in case it is necessary to break a tie.
2) By ballot - Members write their vote on a slip of paper.  Votes are collected and counted by the president.  Any member may move for an exact count.  The president will vote only in case it is necessary to break a tie.

Section 3.  A proxy (authority to act for another) may be issued from one member to another for a vote when a member is unable to attend a meeting.  The proxy must be handwritten and signed, authorizing the member to vote on one particular issue or on any issue that may

arise.  The proxy vote is in force according to the written proxy and may not be changed or altered after the vote is taken.

> *Example 1 : I, Jane Doe, authorize Helen Waite to vote for me on any issue that arises on 2/14/06.  Signed, Jane Doe.*
>
> *Example 2 : I, Jane Doe, authorize Helen Waite to vote for me on the fundraising amendment issue set for the agenda on 2/14/06.  Signed, Jane Doe.*

### Article VI – Finance

The officers shall collect suggestions from the membership and shall determine a method of fundraising for the organization.  The funds shall be spent according to the needs of the organization and shall be at all times for the benefit of the organization as a whole.  The officers shall communicate to the membership the act of and reasons for each expenditure.  If the officers determine that dues should be collected from membership, the membership shall be entitled to vote on the amount, and in no event may the amount be higher than the highest amount collected for any other school club.

### Article VII – Committees

Section 1.   Committes shall be formed to meet specific objectives and shall be formed, as needed, by the officers or by successful motion of any member.

Section 2.  Committee membership is voluntary.

Section 3.  The size of a committee shall not be limited.  A chairperson shall be elected by a majority of committee members, who shall present any actions of the committee to the membership.  A committee shall be organized until its objectives have been completed.

### Article VIII – Amendments

Any member may petition for an amendment to this constitution by submitting a proposal in writing to the president and/or secretary.  The president and/or secretary shall make copies thereof and distribute to every active member as soon as reasonably possible.  In the same distribution, the president and/or secretary shall announce the date, place, and time of the voting for the proposed amendment.  It may only be amended by a 2/3 vote by a public show of hands in favor thereof at a regularly scheduled meeting no earlier than one month after the submission of the proposal.  If the Amendment passes, the secretary shall add it to this constitution and submit it to the members and the school as appropriate.

### Article IX – Severance

If any provision of this constitution is in conflict with the law or a lawfully-enacted school rule, then the offensive provision shall be deemed stricken and the rest of this constitution shall stand in full force.



# The School Board of Okeechobee County



EXHIBIT

_Cooper 13_
_2/6/08_

## Chapter 4.00: Curriculum and Instruction

4.30

## STUDENT CLUBS AND ORGANIZATIONS

**_POLICY_**

I. All student clubs and organizations shall be approved by the principal before they can operate within a school center.

II. All student clubs and organizations shall comply with the following:

A. The decision of the members of an organization shall not be one of the factors in selecting additional members.

B. The charter and constitution of each student club or organization shall set forth the purposes, qualifications for members, and the rules of conduct and shall be maintained on file for immediate reference by all students and instructional personnel of the school.

C. There shall be no type of hazing in any club or organization within the school. Hazing shall be defined as any action or situation for the purpose of initiation or admission into or affiliation with any organization operating under the sanction of the school which recklessly or intentionally endangers a student's mental or physical health or safety.

D. To assure that student clubs and organizations do not interfere with the School Board's abstinence only sex education policy and the School Board's obligation to promote the well-being of all students, no club or organization which is sex-based or based upon any sexual grouping, orientation, or activity of any kind shall be permitted.

E. Dues shall be reasonable and not prohibitive.

F. All meetings shall be held on School Board property. This may be waived for special meetings and events upon the faculty sponsor's request and principal's approval.

G. A faculty sponsor shall be present at all meetings.

H. All social events shall be adequately chaperoned.

I. All monies accruing to any school club or organization shall be accounted for through

the school's internal accounting system.

J. A student club or organization shall not conduct any activity or act which violates Florida Statutes, School Board rules, or the policies of the local school.

K. All students must have signed parent permission slips to participate in any club or organization.

III. Any school club or organization which engages in an initiation ceremony for its members shall prepare and submit the program of initiation exercises to the faculty sponsor for review and approval by the school principal.

| | |
|---|---|
| ***STATUTORY AUTHORITY:*** | 1001.41; 1001.42, F.S. |
| ***LAWS IMPLEMENTED:*** | 1001.43; 1006.07; 1006.09; 1006.135; 1006.14, F.S. |
| ***STATE BOARD OF EDUCATION RULES:*** | |
| ***HISTORY:*** | **Adopted:** 07/14/98 |
| | **Revision Date(s):** 01/16/2007, 10/09/2007 |
| | **Formerly:** New |



The School Board of Okeechobee County

## Chapter 6.00: Personnel

6.43

### UNLAWFUL DISCRIMINATION PROHIBITED

**POLICY**

1. No person shall, on the basis of race, color, religion, sex, age, national or ethnic origin, political beliefs, marital status, disability, if otherwise qualified, social and family background or on the basis of the use of a language other than English by LEP students, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity, or in any employment conditions or practices conducted by this School District, except as provided by law.

2. The School Board shall comply with the Americans with Disabilities Act of 1990 (ADA). This law makes it unlawful to discriminate against a qualified individual with a disability who can perform the essential functions of his / her job with reasonable accommodations.

**STATUTORY AUTHORITY:** 1001.41; 1001.42; 1012.22; 1012.23, F.S.
**LAWS IMPLEMENTED:** 1000.21; 1000.05; 1001.43; 1012.22, F.S.; 34CFR200.43
(C); P.L. 201-44, Code of Federal Register
**STATE BOARD OF EDUCATION** 6A-19.001 et. seq.
**RULES:**
**HISTORY:** Adopted: 07/14/98
Revision Date(s): 10/12/99
Formerly: C-39; D-25; E-6



EXHIBIT
Cooper 18
2/8/08